Argued and submitted March 23, decided April 19, 1911.

## STATE *v.* CASEDAY.

[115 Pac. 287.]

CRIMINAL LAW—CHANGE OF VENUE—LOCAL PREJUDICE.

1. Defendant moved for a change of venue, and filed affidavits to the effect that the homicide had been generally discussed throughout the county, and that several accounts of it had been published in local papers, and that in the opinion of affiants a fair and impartial trial could not be had in that county, and that prominent local taxpayers had employed special counsel to aid the prosecution. *Held*, in analogy to Section 123, L. O. L., relating to a formed opinion of a particular juror sufficient to sustain a challenge, that, the affidavits stating mere opinion as to the state of public feeling without any overt act beyond the engagement of special counsel, the press accounts not being calculated to inflame the public mind, and ninety-eight jurors having been examined in obtaining the jury which tried the cause, there was no abuse of discretion in denying the application.

CRIMINAL LAW—DISCRETION OF LOWER COURT—CHANGE OF VENUE.

2. It is uniformly *held* that a change of venue is discretionary with the trial court.

CRIMINAL LAW—APPEAL AND ERROR—HARMLESS ERROR—CONDUCT OF TRIAL—OVERRULING CHALLENGES TO JURORS.

3. At the beginning of defendant's trial for murder, there were but seven jurors of the regular panel in attendance, and, over defendant's objection, the court directed the names of these to be drawn and their examination to proceed, and four of the seven were excused for cause, and, after special venires had been issued from which the remainder of the jury were impaneled, the three remaining jurors of the original seven were peremptorily challenged by the State. *Held* that, as defendant lost no challenges through the action of the court, the overruling of his objection was harmless.

JURY—CHALLENGES—CHALLENGE TO PANEL—STATUTES.

4. Section 116, L. O. L., provides that, after the ballots containing the names of 'jurors are issued, the sheriff shall summon from the county as many jurors as are necessary; Section 1005 provides that summons may be made by written notice to each personally or by leaving notice at his place of residence with some suitable person; and Section 117 forbids a challenge to the panel. Defendant, on his trial for murder, asked each juror of the special venire on his examination how he had been summoned and challenged those who had been summoned by any person other than the sheriff, without any charge that the sheriff acted otherwise than fairly in the discharge of his duty. Held, that this manner of challenge amounted to a challenge to the panel, expressly forbidden by Section 117.

CRIMINAL LAW—APPEAL AND ERROR—REVIEW—PRESUMPTIONS—SELECTION OF JURY.

5. On appeal it will be presumed that the sheriff's official duty in summoning a special venire of jurors from which to draw a jury for defendant's trial for murder was regularly performed.

CRIMINAL LAW—APPEAL AND ERROR—RECORDS—QUESTIONS PRESENTED FOR REVIEW—SELECTION AND IMPANELING OF JURY.

6. Section 990, subd. 4, L. O. L., makes it a sufficient cause of challenge if a juror has been summoned and attended as such at any term held within one year prior to the challenge, and at defendant's trial beginning June 20, 1910, a juror whose name had been drawn testified that he served "a year ago this spring" on the jury in that court, but did not know when he was discharged. Held, that there was not enough in the record to raise the question of the juror's prior service as a ground of challenge.

JURY—COMPETENCY AND CHALLENGES—JUROR'S FORMED OPINION—INFLUENCE OF OPINION ON VERDICT—STATUTES.

7. A juror, on examination, stated that he was not acquainted with any of the defendants; that he had read accounts of the homicide, and had heard it discussed to some extent, and had expressed his opinion in those discussions; and that his opinion was so fixed that it would require sworn testimony to remove it; but that he could lay aside his estimates of the case and try it fairly and impartially without allowing his opinion to influence him in making up his verdict as a juror. Another juror stated that he was slightly acquainted with defendants, had heard of the crime, discussed it, and read about it, but expressed no opinion, and that he would not take into consideration anything but what was produced at the trial, or was directed by the court. Another juror, who had merely heard of the crime without informing himself as to the facts or expressing any opinion, was present fifteen minutes in court during argument at the trial of another of the defendants. Held, that such jurors were competent under Section 121, L. O. L., providing that a formed or expressed opinion upon the merits of the cause from hearing or reading will not disqualify a juror unless the court is satisfied that the juror cannot disregard such opinion and try the issue impartially.

JURY—COMPETENCY AND CHALLENGES—PEREMPTORY CHALLENGES—ORDER OF EXHAUSTION OF CHALLENGES.

8. Section 1520, L. O. L., declares that in criminal actions the trial jury is to be formed in the manner prescribed in Chapter 2 of Title II of the

Code of Civil Procedure, except as otherwise expressly provided, and Section 1521, L. O. L., a section of the Code of Criminal Procedure, excludes the civil challenge for implied bias, defined by Section 122, and substitutes a challenge of its own which dispenses with an equality in the number of peremptory persons challenged as designated in Section 125, L. O. L. Section 126, L. O. L., provides that the defendant may challenge one and then the plaintiff may challenge one until the peremptory challenges are exhausted, and allows the defendant in criminal actions, double the number of peremptory challenges apportioned to the State. Section 1523, L. O. L., comprised in the Code of Criminal Procedure, allows a defendant in a criminal case twelve peremptory challenges. The Code of Civil Procedure originated in 1862, while the Code of Criminal Procedure originated two years later as an independent act. *Held,* that Section 1520, L. O. L., should be construed as a reference to the Code of Civil Procedure as it was when the Code of Criminal Procedure was enacted, and that Section 125, L. O. L., was amended with reference to the different provisions of the Code of Criminal Procedure as to peremptory challenges, and did not change or supersede Section 1521.

STATUTES—IMPLIED AMENDMENT—AMENDMENT OF RE-ENACTED STATUTE.
9. Where the provisions of one statute are incorporated into another by mere reference, a subsequent change in the former will not affect the terms of the latter.

CRIMINAL LAW—EVIDENCE—PRELIMINARY EVIDENCE AS TO CONSPIRACY OR COMMON PURPOSE.
10. The order of proof in a criminal case is within the discretion of the trial court, and the court may admit acts and sayings of a co-conspirator in the *res gestae* in advance of any preliminary showing of the connection of a defendant with a conspiracy.

CRIMINAL LAW—EVIDENCE—ACTS AND DECLARATIONS OF CONSPIRATORS.
11. After the formation of a conspiracy to commit crime, any act or declaration of one of the conspirators which occurs before the actual commission of the contemplated crime, and which tends to prove the guilt of that conspirator, is equally admissible in evidence against any one of his confederates in a separate trial of the latter.

CRIMINAL LAW—EVIDENCE—DECLARATIONS OF CONSPIRATORS.
12. At defendant's separate trial for murder there was evidence that after defendant, who was a deputy sheriff in charge of a prisoner, returned a rifle and some cartridges to one of the defendants with him, was asked if that was all, he said, "For God's sake! Ain't that enough?" and that the owner of the rifle, in the presence of another defendant, declared, referring to prisoner, "I bet you that man never gets to Canyon," and there was other evidence tending to show a guilty confederation between these parties, who were afterwards indicted jointly. *Held,* that this declaration was admissible against defendant.

CRIMINAL LAW—EVIDENCE—DECLARATION AND ACTS OF CONSPIRATORS—ADMISSIONS PRIOR TO CONSPIRACY.
13. Where a defendant joins a conspiracy after its formation and actively participates in it, he adopts the previous acts and declarations of his fellow conspirators, and the declarations of a fellow conspirator, although made before defendant joined the conspiracy, are admissible in a trial of any one of the conspirators.

CRIMINAL LAW—EVIDENCE—WEIGHT AND SUFFICIENCY—CIRCUMSTAN-
TIAL EVIDENCE—DEGREE OF PROOF.

14. In a prosecution for murder, a requested instruction that, to convict
for a criminal offense on circumstantial evidence, the State must show such
facts and circumstances as are absolutely incompatible upon any reason-
able hypothesis with defendant's innocence, and incompatible of explana-
tion except by defendant's guilt, is properly refused, since the law does
not require such a degree of certainty as the term "absolutely" implies,
but requires only moral certainty to the exclusion of reasonable doubt
of the defendant's guilt.

CRIMINAL LAW — TRIAL — REQUEST FOR INSTRUCTIONS — INSTRUCTION
ALREADY GIVEN.

15. The refusal of a particular instruction directing a verdict for
defendant on any reasonable theory of innocence is not ground for com-
plaint, where that instruction is otherwise given.

CRIMINAL LAW—PROVINCE OF COURT AND JURY—WEIGHT AND SUFFI-
CIENCY OF EVIDENCE—CONFESSIONS AND ADMISSIONS.

16. An instruction on the conclusiveness of confessions and admissions,
following the language of Section 1537, L. O. L., that, notwithstanding
admissions and confessions of a defendant may be given against him on
his trial, they alone are not sufficient to warrant a conviction without
some other proof that the crime has been committed, is not objectionable
because it does not state the degree of proof necessary to supplement
the original admissions or confessions, since the degree of proof is for
the jury, and the court cannot weigh the testimony for the jury, inde-
pendent of the admissions or confessions.

CRIMINAL LAW—TRIAL—INSTRUCTIONS—APPLICATION TO CASE—ADMIS-
SIONS AND CONFESSIONS.

17. Where there is evidence in a prosecution for murder that state-
ments were made by defendant after the homicide, an instruction dis-
tinguishing between confessions and admissions is justified.

HOMICIDE—TRIAL—INSTRUCTIONS—MANSLAUGHTER.

18. Sections 1897, 1898, 1899, and 1902, L. O. L., define manslaughter
as it may be committed under different circumstances; Section 1898
declaring that where a person, in the commission of a lawful act without
due caution or circumspection, involuntarily kills another, he shall be
deemed guilty of manslaughter. Defendant in a prosecution for murder
was a deputy sheriff, jointly indicted with others and tried separately
for the murder of a prisoner; the State contending that, as a result of an
agreement between the defendants, the prisoner was taken to a meeting
place and lynched. *Held* that, on the theory that defendant in proceed-
ing with his prisoner alone after being warned of a plot to lynch him
was performing a lawful act without due care, on account of which the
homicide occurred from the unlawful acts of other persons, no instruction
on manslaughter as defined by Section 1898 is necessary.

HOMICIDE—TRIAL—INSTRUCTIONS — MANSLAUGHTER — ABSENCE OF EVI-
DENCE.

19. Where there is no evidence on the trial of a person for murder
tending to reduce the homicide to manslaughter, the court is not required
to charge with reference to the lesser crime.

HOMICIDE — TRIAL — INSTRUCTIONS — MANSLAUGHTER — APPLICATION
TO ISSUE.

20. Defendant was indicted jointly with others and separately tried
for murder for having participated in an alleged agreement by which
he was to take a prisoner then held by him in his capacity as a deputy
sheriff to an agreed meeting place, where the prisoner was to be taken
from his control and lynched. *Held,* that whether defendant honestly
thought that the alleged threats of his codefendants were drunken bluff
and started alone with his prisoner—and the prisoner was taken and
lynched without his consent, or whether he weakly surrendered him to
death, there was no theory on which to predicate manslaughter, and an
instruction thereon was properly refused.

From Grant: GEORGE E. DAVIS, Judge.

Statement by MR. JUSTICE BURNETT.

Joseph H. Caseday was jointly indicted with Emmett
Shields, Earl Shields, Albert Green, and Ben Hinton for
the premeditated murder of Oliver Snyder. The better
to comprehend the situation it is proper to state that
Canyon City, the county seat, is located near the center
of Grant County. About 30 miles to the northwest is
the village of Hamilton, and Monument is situated about
nine miles farther in the same direction. Some miles still
farther on that course, on the evening of December 24,
1909, in an altercation in a sheep herder's cabin, Oliver
Snyder killed Arthur Green and at once fled, secreting
himself in the woods on the adjacent hills. Mr. Beymer
an eyewitness, notified the officers and summoned help.
The defendant, Caseday, at that time was acting as
deputy sheriff, and, hearing of the homicide, took with
him a justice of the peace for the purpose of holding an
inquest, borrowed a gun belonging to his codefendant
Emmett Shields, and proceeded toward the scene of the
killing. Arriving at Monument, and learning that Snyder
had given himself up, the defendant left the rifle and went
on until he met some men bringing in the body of Arthur
Green and having Snyder under arrest. Caseday then
took charge of Snyder and returned toward Monument.
Soon after the defendant started from Hamilton toward
Monument, the defendants Emmett Shields, Earl Shields,

and Albert Green went together in a buggy to Monument. On returning to Monument with the prisoner, Caseday at once sought Albert Green and found him in a saloon, took him out in the rear of the building, and had a private conference with him out of the hearing of other persons. He directed the man with whom he had left the rifle to return it to Emmett Shields. Soon after, meeting Emmett in the saloon, the latter asked him for the cartridges belonging to the rifle. Caseday produced them, and, when Emmett asked him if that was all, the former ejaculated: "For God's sake! Ain't that enough?" The parties held a number of private conferences in and about the saloon in Monument, and later in the evening about eight o'clock, Caseday started with the prisoner to drive to Hamilton, following two other men who took with them the body of Green. Arriving in Hamilton, all the parties stayed there until between 2 and 3 o'clock the following morning. Also in Hamilton there were frequent conferences in private between the defendant, Caseday, and others of the defendants. Emmett Shields was heard to state that they would never get to Canyon City with Snyder. He and the defendant Hinton also solicited various persons to assist in hanging Snyder. There is testimony tending to show that, although Caseday had assistance in bringin Snyder as far as Hamilton, he represented to the assistant that they would stay all night in Hamilton and go to Canyon City the next day; but, disregarding that arrangement, he took the prisoner alone and left for Canyon City about three o'clock in the morning. Although warned of plans to lynch Snyder and advised to take assistance, he curtly declined any help. The testimony also tends to show that his four codefendants left Hamilton on horseback in advance of him and took the road leading to Canyon City. The defendant Hinton was convicted on a separate trial of murder in the second degree, and testified at the trial of Caseday,

giving the details of taking and killing the prisoner about two miles out of Hamilton towards Canyon City. The foregoing is a statement of only some of the salient features of the voluminous testimony in the record. The contention of the State is, in substance, that the matter of lynching Snyder was arranged among the defendants Shields, Green, and Hinton, and that Caseday was approached on the subject and consented to play the part of taking the prisoner ostensibly under arrest to the place where the other defendants, by a pretense of force, should take him away from the officer and lynch him. The separate trial of Caseday resulted in a verdict of guilty of murder in the first degree, and from the resultant judgment he appealed.                    AFFIRMED.

For appellant there was a brief with oral arguments by *Messrs. Leedy & Patterson.*

For the State there was a brief over the names of *Mr. John W. McCulloch,* district attorney, *Mr. Wells W. Wood,* deputy district attorney, *Mr. James E. Fenton, Mr. Andrew M. Crawford,* attorney general, and *Mr. Roy F. Shields,* second assistant attorney general, with an oral argument by *Mr. Crawford* and *Mr. Shields.*

MR. JUSTICE BURNETT delivered the opinion of the court.

1. The first error assigned is the refusal of the court to change the place of trial. The defendant filed his own affidavit and that of one of his attorneys, together with two others, to the effect that the killing of Snyder had been generally discussed throughout the county; that several accounts of the homicide had been published in the local papers; and that in their opinion a fair and impartial trial could not be had in that county. It is also charged that some of the prominent taxpayers had employed special counsel to aid in the prosecution. The State filed counter affidavits, in substance giving a con-

trary opinion as to the probability of getting a fair and impartial jury. The affidavits amount to no more than the mere opinion of the affiants as to the state of the public feeling. On the part of the defendant there is no showing of any overt act indicating prejudice against him except in the employment of special counsel. Who or how many of the citizens of the county participated in that employment is not shown. The newspaper accounts attached to the affidavits are devoid of sensation calculated to inflame the public mind. The press accounts were mere statements as matters of news of the testimony given at the trial of Hinton and other incidents relating to the homicide. The showing is in substance equivalent to the statement that possibly the public may have formed a general opinion of the guilt or innocence of the defendant from what it has heard or read. This situation as to the material available for jurors is analogous to what is contemplated in Section 123, L. O. L., to the effect that such an opinion shall not of itself be sufficient to sustain a challenge to a particular juror, but the court must be satisfied from all circumstances that the juror cannot disregard such opinion and try the issue impartially.

2. It is uniformly held that a change of venue is discretionary with the trial court. The jury in this case was impaneled after the examination of 98 men. We cannot say that the judicial discretion was abused in denying the application to change the place of trial. The decision of trial courts denying motions to change the venue on much stronger showing than exhibited here was upheld in the following cases: *State* v. *Pomeroy,* 30 Or. 16, 19 (46 Pac. 797) ; *State* v. *Savage,* 36 Or. 191, 198 (60 Pac. 610: 61 Pac. 1128) ; *State* v. *Armstrong,* 43 Or. 207, 211 (73 Pac. 1022) ; *State* v. *Smith,* 47 Or. 485, 487 (83 Pac. 865) ; *State* v. *Mizis,* 48 Or. 165, 174 (85 Pac. 611: 86 Pac. 361).

Twenty-five assignments of error in the bill of exceptions relate to the manner of forming the jury.

3. At the beginning of the trial there were but seven jurors of the regular panel in attendance. The names of these were taken from the box at once, and the court directed counsel to proceed with their examination, to which the defendant objected until the full number of twelve had been drawn. The court overruled the objection, and the seven were examined, with the result that four of them were excused for cause. Afterwards special venires for 50, 40, and 25 jurors were issued in succession, from which the remainder of the jury was impaneled. As this progressed the three remaining jurors of the original seven were peremptorily challenged by the State, so that as to them no harm was done the defendant; he lost no challenges on either of them.

4. In respect to the formation of the jury, Section 116, L. O. L., prescribes that:

"When the action is called for trial the clerk shall draw from the trial jury box of the court, one by one, the ballots containing the names of the jurors until the jury is completed or the ballots are exhausted. If the ballots become exhausted before the jury is complete, the sheriff, under the direction of the court, shall summon from the bystanders, or the body of the county, so many qualified persons as may be necessary, to complete the jury."

According to Section 1005, L. O. L., the sheriff summons persons named in the panel by giving written notice to each of them personally or by leaving the same at his place of residence with some person of suitable age and discretion. As each juror from the special venires was examined, and the defendant inquired of him by whom he was served, and to each one answering that he was served by some person other than the sheriff himself in person, the defendant objected because of that. This, in our judgment, amounts to a challenge to the

panel, which is forbidden by Section 117, L. O. L. The only challenges allowed are peremptory or for cause. Challenges for cause are arranged under two subdivisions: (1) General, that the juror is disqualified from serving in any action; or (2) that he is disqualified from serving in the action on trial. The general causes for challenge are: First, a conviction for felony; second, a want of any of the qualifications prescribed by law for a juror; and, third, unsoundness of mind or such defect in the faculties of the mind, or organs of the body, as renders him incapable of performing the duties of a juror. And the particular causes of challenge are for actual or implied bias. Sections 117-123, L. O. L. These provisions of the Code so particularly delimit objections to jurors as to exclude almost every *quasi* judicial feature from the duty of the sheriff in summoning talesmen. The mere act of delivering notice is purely ministerial, and it might well happen that the sheriff himself designated the citizens of the county to be summoned and directed his deputies, or, for that matter, any one else, to hand the statutory notice to those selected. There is nothing in the objections of the defendant as reported in the bill of exceptions to exclude this hypothesis. There is no charge that the sheriff acted otherwise than fairly in the discharge of his duty.

5. We must presume that his official duty was regularly performed. The end to be attained is an impartial jury, and this is finally determined by the examination of the men themselves under the sanction of the court at the trial of the cause. The result is not affected by the question of whether or not the sheriff in person or his deputy delivered the notice to the jurors under consideration. The manner in which they were served constitutes the only objection urged by defendant to ten of the jurors participating in the verdict, and, in the absence of any showing of partiality in the action of the sheriff, there is no merit in that objecton.

Except for the order in which the court required the parties to exercise their peremptory challenges, the dispute about the formation of the jury is narrowed to a consideration of the rulings on the eligibility of the last three jurors examined.

6. With but one peremptory challenge left, the name of J. W. Allen was drawn from the box. He testified that he served "a year ago this spring" on the jury in that court, but did not know when he was discharged. The trial began June 20, 1910. The statute says that it is a sufficient cause of challenge if a juror has been summoned and attended as such at any term held within one year prior to challenge. Section 990, subd. 4, L. O. L. "A year ago this spring" would be more than one year prior to the beginning of the trial, and there is not enough in the record to raise the question on that ground of challenge.

7. Allen further testified that he was not acquainted with any of the defendants; that he had read the account of the killing of Snyder, had heard it discussed some, but not to any great extent; that he sometimes took part in the conversations and had expressed his opinion in those conversations. He had heard some of what purported to be the facts developed in the trial of Hinton, and from what he had heard he had formed and expressed a fixed opinion as to the guilt of the defendant, Caseday, at the present time which it would require sworn testimony to remove. He stated, however, substantially that he could lay aside his estimate of the case and try it fairly and impartially; would not allow his previous conceptions to influence him if taken as a juror; that his opinion would not have any influence whatever in making up his verdict; that the view he had was not formed from talking with witnesses or jurors who had participated in the trial of Hinton, but arose from talking with people about the case and from reading the papers. The court overruled the

defendant's challenge for bias of this juror, and afterwards the defendant used upon him his last peremptory challenge.

The juror Cook was slightly acquainted with the defendants Caseday and Albert Green, but not with the defendant Shields. He had heard of the killing of Snyder and read about it in the local papers; had talked some with other people about it, but had not expressed any opinion himself. He was absent in Portland during the trial of Hinton, had not formed an opinion as to the guilt or innocence of Caseday, and stated that he would not take into consideration what he had heard or read of the evidence in the trial against Hinton, but would go by what was produced in the present trial; that he would not consider the fact that Hinton had been convicted unless the evidence showed a connection between Hinton and Caseday, in which event he would give some consideration to the conviction of Hinton; but on examination by the court he answered that he would surely go by the directions of the court not to consider the fact that Hinton was convicted.

Bert Howard was not acquainted with any of the defendants; had heard of the killing of Oliver Snyder, had heard the name of the defendant used in connection with it only as a deputy sheriff at the time; had read the county paper; and had participated in the discussion of the reports; but had not taken enough interest in the matter to inform himself as to the facts for his own satisfaction and had not expressed any opinion as to the guilt or innocence of Caseday. He was present in Canyon City about 15 minutes while some one of counsel was arguing the case of Hinton to the jury, but who it was he did not remember.

The court overruled the challenges for cause made by the defendant against the jurors Cook and Howard and permitted them to participate in the trial of Caseday.

"A challenge for actual bias may be taken for the cause mentioned in the second subdivision of Section 121; but on the trial of such challenge, although it should appear that the juror challenged has formed or expressed an opinion upon the merits of the cause from what he may have heard or read, such opinion shall not of itself be sufficient to sustain the challenge, but the court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially." Section 123, L. O. L.

The defense, to sustain these challenges, relies upon the case of *State* v. *Miller,* 46 Or. 485 (81 Pac. 363). In that case some of the talesmen testified that they were in court at the former trial when the widow of the decedent gave her testimony; that they had talked to a good many witnesses who gave testimony at the former trial, and also to some of the jurors who returned a verdict of guilty therein; that they detailed as nearly as they could the facts involved, and, having confidence in what they said, the jurors had formed a fixed opinion as to the merits of the case which it would require strong testimony to overthrow, and which would prevent the parties starting on an equal race in the trial; but that if accepted as jurors they could lay aside such prejudice and try the case fairly and impartially. This court reversed the circuit court on this point with the statement that: "As we remember the testimony given at the former trial by Mrs. Curtis, who heard the fatal shots fired that made her a widow, we do no believe any person could listen to her recital of the facts without forming such an opinion as to render him biased as to the merits of the case. Nor could a person hear the witnesses or the jurors tell the story of the homicide, as it was unfolded in court, without forming such an opinion as to the guilt or innocence of the defendant as to render him prejudiced in the matter."

Intelligent men having any local interest in such an occurrence as a supposed murder will usually form an

opinion about the merits by reading newspaper accounts
and hearing the average neighborhood discussion of the
subject.    The administration of justice would become
impossible if such an opinion of itself disqualified a juror.
This is the reason underlying Section 123, L. O. L., *supra.*
An opinion may be satisfactory to the man being exam-
ined as a juror, considering the fact that hitherto he
has sustained no relation to the case different from any
other citizen of the county.   While he occupies that stand-
point only, he may require testimony before changing his
opinion.    Under such circumstances his opinion may be
in a sense fixed, because he has had no occasion to think
otherwise.    When a talesman having that attitude of
mind is being examined, the question is whether, upon
assuming the particular relation of juror in the case as
distinguished from his previous general relation as a
member of the community, he will abandon the con-
comitants of the latter and submit himself to the con-
ditions and obligations of the former.   The doctrine of
the statute is that the two relations are not necessarily
incompatible, but that to disqualify such a juror "the
court must be satisfied, from all the circumstances, that
the juror cannot disregard such opinion and try the issue
impartially."

The examination of Allen, Cook and Howard reveals
a mental state in them widely different from that of the
jurors under consideration in the case of *State* v. *Miller,*
46 Or. 485 (81 Pac. 363.)   There they had attended the
trial and heard the testimony, had talked in detail with
witnesses and jurors of a former trial, and had in effect
thoroughly tried and determined the issue, substantially
traversing the same course to be then pursued in the new
trial.    The tentative opinions of the jurors here fall far
short of the standard of actual bias established in that
decision.    In the last analysis, jury service is voluntary, a
duty owing from the people to the government of the peo-

ple. The process of the court may bring before it any citizen as a juror; but, if he is unwilling to serve, he can with impunity easily display such a state of mind as to disqualify him by any fair standard. He is answerable only to his conscience for his dereliction, for no one can look into his mind, as into his pockets, and ascertain its contents. The law has left to the court the estimation of a juror's fitness. The presiding judge sees and hears the juror, and so can far more wisely determine his qualifications than the appellate court can from a case made upon paper, and, unless a strong case of abuse of discretion by the trial court is made to appear, its decision on such a point cannot be disturbed. If a juror is honest enough fully and fairly to state to the court the sources of his information about the case and the conditional or even satisfactory opinion he entertains from that viewpoint, remembering that usually the only testimony available on examination of a juror is his own, we cannot say that the court erred in accepting the juror's pledge to decide the issue according to the law and the evidence as given him upon the trial, notwithstanding his previous mental attitude.

8. The defendant questions the right of the court to compel him to exercise two peremptory challenges to the State's one until he exhausted the twelve allowed him by Section 1523, L. O. L. The defense relies upon Section 126, L. O. L., to support his contention that, beginning with the defendant, peremptory challenges should be used one by one alternately between the parties. That section was adopted substantially from the laws of the State of Washington by the legislative assembly of 1909 (Laws 1909, p. 89, § 1), and reads as follows:

"The full number of jurors having been called shall thereupon be examined as to their qualifications, first by the defendant and then by the plaintiff, and having been passed for cause, peremptory challenges shall be conducted as follows, to wit: The defendant may chal-

lenge one, and then the plaintiff may challenge one, and
so alternating until the peremptory challenges shall be
exhausted. After each challenge, the panel shall be filled
and the additional juror passed for cause before another
peremptory challenge shall be exercised, and neither party
is required to exercise a peremptory challenge unless the
full number of jurors are in the jury box at the time. The
refusal to challenge by either party in the said order of
alternation shall not defeat the adverse party of his full
number of challenges, and such refusal on the part of said
party to exercise his challenge in proper turn shall con-
clude him as to the jurors once accepted by him, and if his
right of peremptory challenge be not exhausted, his
further challenges shall be confined, in his proper turn,
to such additional jurors as may be called. The court
may, for good cause shown, permit a challenge to be
taken to any juror before the jury is completed and sworn,
notwithstanding the juror challenged may have been
theretofore accepted, but nothing herein shall be con-
strued to increase the number of peremptory challenges
allowed by other provisions of law."

If it is correct to assume, as counsel for defendant
apparently contend, that this section applies to criminal
trials, the action of the court may be defended on the
principle that, having adopted the statute of another
State, we adopt with it the judicial construction given
to the statute by the courts of that State. *Crawford* v.
*Roberts,* 8 Or. 324; *McIntyre* v. *Kamm,* 12 Or. 253 (7
Pac. 27) ; *Trabant* v. *Rummell,* 14 Or. 17 (12 Pac. 56) ;
*Everding* v. *McGinn,* 23 Or. 15 (35 Pac. 178). In *State*
v. *Eddon,* 8 Wash. 292, 305 (36 Pac. 139), the Supreme
Court of that State construed their statute from which
Section 126, L. O. L., was taken, to mean that the per-
emptory challenges should be used first by one party
and then by the other in proportion to the number allotted
to each, working out as a result that, where the defend-
ant was allowed twelve and the State six, the former
should use two to the State's one of such challenges.
Similar statutes have received like construction in Idaho

and Montana. *State* v. *Browne,* 4 Idaho 723 (44 Pac.
552) ; *State* v. *Sloan,* 22 Mont. 293 (56 Pac. 364).

In our judgment, however, it is not necessary to rely
on this construction of the law. The Code of Civil Pro-
cedure has its origin in the act of the legislative assembly
of October 11, 1862, while the Code of Criminal Proced-
ure is embodied in the act of October 19, 1864, and
amendments thereto. Deady's Code, pp. 139, 441. They
are independent acts having no relation to each other
except as provided by reference from the latter to the
former. In the formation of the jury the Criminal Code
declares that:

"In criminal actions, the trial jury is formed in the
manner prescribed in Chapter II of Title II of the Code
of Civil Procedure, except as otherwise expressly pro-
vided in this chapter." Section 1520, L. O. L.

The Criminal Code in the same chapter excludes the
civil challenge for implied bias (Section 122, L. O. L.),
and substitutes one of its own (Section 1521, L. O. L.),
besides dispensing with the equality in the number of
peremptory challenges designated in Section 125, L. O. L.,
and allowing the defendant in criminal actions double
the number apportioned to the State. In these respects
the Criminal Code itself provides otherwise than the
Civil Code. Section 1520, L. O. L., must be construed to
be a reference to the Civil Code as it was at the date of
the enactment of the Criminal Code. It is as if chapter
2 of title 2 of the act of October 11, 1862, except sections
122 and 125, were reprinted in the Criminal Code as part
of the latter.

9. It is a rule of statutory construction in this State
that, where the provisions of one statute are incorporated
into another by mere reference, a subsequent change in
the former will not disturb the terms of the latter. *Til-
lamook City* v. *Tillamook County,* 56 Or. 112 (107 Pac.
482) ; *Sika* v. *C. & N. W. Ry. Co.,* 21 Wis. 375; *People ex*

*rel.* v. *Webster*, 8 Misc. Rep. 133 (28 N. Y. Supp. 646) ;
*Shull* v. *Barton*, 58 Neb. 741 (79 N. W. 732) ; *Schwenke*
v. *Union Depot*, 7 Colo. 512 (4 Pac. 905) ; *Ex parte Crow
Dog*, 109 U. S. 556 (3 Sup. Ct. 396: 27 L. Ed. 1030) ;
*Wick* v. *Ft. Plain Ry. Co.*, 27 App. Div. 577 (50 N. Y.
Supp. 479). We conclude that the legislative assembly in
amending Section 126 in 1909 must have had in mind
the autonomy of the Criminal Code as a separate act;
that it was otherwise provided therein about the per-
emptory challenges; and that on account of the disparity
between the number allowed to each party in criminal
cases it would be impracticable to have them alternate
one by one. Thus the Criminal Code was left intact.
Strictly speaking, the court could have required all chal-
lenges to be taken by both parties as to each juror before
another was drawn from the box, but they were indulged
by the court in making their peremptory challenges to
particular jurors after the others were examined. The
defendant's rights were not abused. He was not deprived
of any of the means by which the law allows him to
exclude jurors from the panel. The trial jury was legally
and properly selected.

It is impossible within the limits of an ordinary opinion
to notice in detail each one of the 141 assignments of
error noted in the bill of exceptions. The principal con-
tention of the defendant is that the court erred in
admitting testimony about the actions and private con-
ferences between the defendants Shields, Green, and Case-
day in Monument and Hamilton the evening before the
killing of Snyder and of the declarations and threats of
Shields and his conduct in trying to get different parties
to help hang Snyder. This theory of objection runs
throughout the case and is the foundation of most of
the exceptions to the charge of the court. It is rare that
a criminal conspiracy can be proven by direct and posi-
tive testimony. Most generally the prosecution is com-
pelled to rely on circumstantial evidence.

10. It is within the discretion of the court, not only by virtue of our statute, but also in pursuance of numerous cases, to regulate the order of proof, and it may well happen that the delineation of the *res gestae* will disclose acts and sayings of co-conspirators in advance of any showing of the connection of a particular defendant with that conspiracy, all without error. A careful perusal of the testimony which is reported in full with the bill of exceptions convinces us that at least a *prima facie* case of participation in the conspiracy is shown as against Caseday.

11. After the formation of a conspiracy to commit crime, any act or declaration of one of the conspirators, which occurs before the actual commission of the contemplated crime, and which tends to prove the guilt of that conspirator, is equally admissible in evidence against any one of his confederates in a separate trial of the latter. If not connected with the deeds of those who actually gave Snyder his lethal wounds, the defendant, Caseday, did nothing criminal in itself. Taking the prisoner to the scene of his death was innocent enough when considered alone. It therefore became necessary to the conviction of the defendant to show that this ostensibly blameless act was by him made a part of a criminal scheme in which he and his co-defendants, or some of them, participated with the design to slay Snyder. Hence arose the requirement of proving a conspiracy for that purpose. Further, if the State would impart criminality to this apparently innocent act of the defendant, Caseday, it was important to prove not only that he thus acted his part in the tragedy, but also that the others of the cast, or some of them, performed theirs, and to that end anything that tended to show the guilt of any of them was admissible against him provided it happened during the existence of the conspiracy.

12. In the presence and hearing of his brother Earl, armed with a rifle, having in his possession the cartridges returned to him by the defendant saying, "For God's sake! Ain't that enough?" Emmett Shields declared: "I bet you that man never gets to Canyon." This was surely admissible against the declarant, and, in conjunction with the other evidence tending to show guilty confederation between him and Caseday, it was also competent as against the latter. This is but an illustration of other like circumstances disclosed by the testimony.

13. It is contended that some of these declarations of Caseday's co-defendants were made before there was any showing of participation on his part in the alleged conspiracy. This cannot affect the case if in fact Caseday did participate in the conspiracy and aided in bringing about the fatal consummation. If a conspiracy is in fact formed and progress is made towards its consummation, when a defendant actively participates in such conspiracy he adopts the previous acts and declarations of his fellow conspirators. In a sense he finds the conspiracy a going concern, adds his ability to its criminal capital, and so becomes as much a part of the enterprise as if he were one of its founders. Hence the declarations of a fellow conspirator, although made before the defendant joins the lawless association, are admissible in the trial of any one of them. *Smith* v. *State,* 21 Tex. App. 96 (17 S. W. 560) ; *State* v. *Crab,* 121 Mo. 554 (26 S. W. 548) ; *Sands* v. *Commonwealth,* 21 Grat. (Va.) 871; *Kelley* v. *People,* 55 N. Y. 565 (14 Am. Rep. 342) ; *Commonwealth* v. *Waterman,* 122 Mass. 43; *Krens* v. *State,* 75 Neb. 294 (106 N. W. 27) ; *Borrego* v. *Territory,* 8 N. M. 446 (46 Pac. 349) ; *Collins* v. *State,* 138 Ala. 57 (34 South. 993) ; *Trevino* v. *State* (Tex. Cr. R.) 41 S. W. 609; *Wilkerson* v. *State* (Tex. Cr. R.) 57 S. W. 956; *Mercer* v. *State,* 40 Fla. 216 (24 South. 154: 74 Am. St. Rep. 135) ; *State* v. *Dilly,* 44 Wash. 207 (87 Pac. 133) ; *State* v. *Darling,* 199 Mo. 168 (97 S. W. 592).

14. The court refused the following instruction requested by defendant:

"Where a conviction for a criminal offense is sought upon circumstantial evidence alone, the State must show beyond a reasonable doubt that the alleged facts and circumstances are true, and they must be such facts and circumstances as are absolutely incompatible upon any reasonable hypothesis with the innocence of the accused and incapable of explanation upon any reasonable hypothesis other than that of the guilt of the accused. If all the facts and circumstances relied on by the State to secure a conviction can be reasonably accounted for upon any theory consistent with the innocence of the defendant, such facts and circumstances are not sufficient to sustain a conviction."

This instruction, taken as a whole, is erroneous. The term "absolutely" implies mathematical demonstration which is a degree of proof impossible in any matter involving the actions of human beings. The law does not contemplate such a degree of certainty, but requires only moral certainty to the exclusion of reasonable doubt of the guilt of the defendant. *State* v. *Glass*, 5 Or. 73.

15. The latter part of the instruction, directing in substance a verdict for the defendant if any reasonable theory consistent with his innocence could be derived from the testimony, was otherwise given in the charge of the court.

16. The court also gave this instruction:

"Notwithstanding the admissions and confessions of a defendant may be given against him on his trial for crime, such admissions or confessions are not alone sufficient to warrant a conviction without some other proof that the crime has been committed."

The defendant contends that this part of the charge is erroneous because it does not state the degree of proof necessary to supplement the original admission or confession. The language is practically that of the Code (Section 1537, L. O. L.), and in that respect differs from

Sig. 15

the statute of the State of California from which citations are made in support of this assignment of error. The degree of proof, or, in other words, the effect of the evidence, is for the jury, and under our statute the court cannot weigh the testimony for the jury independent of the admissions or confessions.

17. The defendant further complains of the following instruction:

"The testimony of some witnesses has been offered by the State to show certain oral statements made by the defendant now on trial, after the death of Oliver Snyder. In criminal law a statement voluntarily made by a person of a fact only, which is as consistent with his innocence as with his guilt, and is made exculpatory, or in explanation of any suspicious or incriminating circumstances, is an admission; but when the statement carries with it a suggestion of guilt, either as to the character of his intent, or the quality of his act, and the statement is made inculpatory, such statement is in the nature of a confession."

Taken in connection with the whole of the court's charge, the learned judge was simply distinguishing between confessions and admissions with a view of explaining the latter to the jury. There is abundant evidence in the record to authorize an instruction about admissions, for the witnesses detailed several things stated by the defendant after the killing of Snyder, and the distinction made by the court was quite proper within the meaning of *State* v. *Heidenreich,* 29 Or. 381 (45 Pac. 755), and *State* v. *Porter,* 32 Or. 135 (49 Pac. 964).

Some questions about cross-examination of witnesses are raised in defendant's brief; but none of them are meritorious or show any erroneous exercise of the court's authority over those features of the trial as defined by our Code. Section 856, L. O. L.

18. At the close of the charge counsel for defendant asked that the jury be instructed as to the crime of

manslaughter. Sections 1897, 1898, 1899, and 1902 of our Code separately define manslaughter as the same may be committed under different circumstances. The request was general in its terms and did not indicate what particular kind of manslaughter the defendant wished to be explained to the jury. The only indication we find in the brief of the appellant on that point is the quotation of Section 1898, L. O. L., viz:

"If any person shall, in the commission of an unlawful act, or a lawful act without due caution or circumspection, involuntarily kill another, such person shall be deemed guilty of manslaughter."

We are at a loss to perceive how this section applies to the case in hand unless it be claimed that in proceeding towards Canyon City with his prisoner alone after being warned of a plot to lynch Snyder, the defendant performed a lawful act without due care or circumspection on account of which the death of the prisoner occurred.

19. In our judgment this section does not apply even to such a hypothesis. If the death of Snyder was the direct result of the negligent act of Caseday without the voluntary intervention of any other human agency, or, in other words, if his negligence operating as a proximate cause in conjunction only with natural causes resulted in Snyder losing his life, the section quoted would be applicable; otherwise not. There is no theory of the evidence supporting or giving color to such a situation. If we consider the conduct of the defendant as only negligent, still it was not the proximate agency which accomplished the death of Snyder. The voluntary act of other persons in shooting him was the immediate cause of his demise, so that the actions of the defendant will not operate to increase his mere heedlessness to manslaughter or to reduce to that grade a more serious homicide. "The rule is well settled that, on a trial of a person for the crime

of murder, if there is no evidence tending to reduce the homicide to manslaughter, it is not incumbent upon the court to charge with reference to the lesser crime." *State v. Magers,* 35 Or. 520 (57 Pac. 197) ; *State v. Megorden,* 49 Or. 259 (88 Pac. 306).

20. If the defendant honestly thought the alleged threats of his co-defendants were drunken bluff, and so started alone with his prisoner, although against the judgment of cooler heads, and the tragedy ensued without his consent, he ought to have been acquitted. Again, if from mere bravado he went on his way intending to overcome all attempts against his charge, and at the critical moment his courage failed, and he weakly gave up Snyder to his death, still he did not violate the law. But if, on the other hand, having knowledge of and being a party to the alleged conspiracy to kill Snyder, the defendant agreed or consented to take him to the scene of the killing, ostensibly in the performance of a duty enjoined upon an officer of the law, but in real truth as a part the defendant was to act in the tragedy, he was guilty of a degree of homicide greater than manslaughter.

In our opinion upon the whole case there is no halfway ground for the defendant to occupy between innocence and murder. The trial court went as far as proper in his favor in advising the jury about the degrees of homicide. There being no theory of the evidence upon which to predicate manslaughter, the court was right in refusing an instruction upon that point. To accede to defendant's request in that respect would have been turning the jury loose to speculate outside of the evidence, and, as the slang goes, to "return a verdict on general principles." It would have exposed the defendant to a danger not at all justified by the evidence or the law applicable to the case. The alternative of the defendant's innocence or his guilt of the only species of homicide which could be derived from any reasonable theory arising from the

testimony was fairly submitted to a jury of his peers, and that jury has decided the dilemma against him.

The judgment is affirmed.                          AFFIRMED.