Argued February 10, affirmed April 6, petition for rehearing denied
    October 5, second petition for rehearing denied November 16,
    1920.

## STATE v. HOLBROOK.

(188 Pac. 947; 192 Pac. 640; 193 Pac. 434.)

Criminal Law—Admission of Evidence of Experiments or Demonstra-
    tions Discretionary.

1. Admission of evidence of experiments or demonstrations is dis-
cretionary with trial court; but when it appears that the experi-
ment or demonstration has been made under conditions similar to
those existing in the case in issue, its discretion ought not to be
interfered with.

On right of defendant in homicide case to introduce evidence of his
good character, see notes in 103 Am. St. Rep. 891; 11 Ann. Cas. 1189.
    On extent to which cross-examination is permissible to show hostility
or ill will of witness, see note in Ann. Cas. 1914B, 537.
    On general and common-law rules as to admission of evidence in
action for homicide in the commission of felonies, see note in
63 L. R. A. 354.
    Authorities discussing the question of general rule as to ad-
missibility of evidence of character for peacefulness and quiet of
deceased in action for homicide are collated in notes in 4 Ann. Cas.
338; 11 Ann. Cas. 229; 3 L. R. A. (N. S.) 368.
    On admissibility of previous statements by a witness out of court
consistent with his testimony, see note in 41 L. R. A. (N. S.) 857.

**Criminal Law—Admission of Evidence as to Experiments Held not an Abuse of Discretion.**

2. In homicide prosecution, admission of evidence as to experiments in tracing footprints, and in discharging rifle with certain kind of cartridge, to ascertain whether smoke could be seen from the discharge, where experiments were made under same conditions as existed on day of killing, *held* not an abuse of discretion.

**Homicide—Testimony of Conversation of Deceased With Defendant's Employee Held Inadmissible.**

3. In homicide prosecution, testimony by an employee of deceased as to a conversation between deceased and an employee of defendants relating to negotiations about employment of defendant's employee by deceased, *held* inadmissible.

**Homicide—Testimony as to Ownership of Land on Which Homicide Took Place Held Inadmissible.**

4. In prosecution for homicide, committed following a dispute as to the right to use land for grazing purposes, testimony of an abstractor as to ownership of lands by one of the defendants *held* inadmissible, particularly in view of concession by state that land was owned by one of the defendants.

**Homicide—That Deceased Became Angry on Day Previous to Killing, Because of Inability to Lease Land, Inadmissible.**

5. In prosecution for homicide, committed following a dispute as to use of land for grazing purposes, testimony as to appearance of anger on part of deceased on the day previous to the homicide, when he learned that he would be unable to lease land because of owner having sold it, *held* inadmissible.

**Witnesses—Impeachment must be According to Statutory Method.**

6. Under Sections 863, 864, L. O. L., a party to impeach the testimony of an adverse witness, must pursue the statutory method.

**Criminal Law—Declarations of Deceased's Employee not Binding on Deceased.**

7. In homicide prosecution, declarations by employee of deceased as to what deceased was going to do could not bind the deceased.

**Witnesses—Inconsistent Statements, Used for Impeachment, must Relate to Testimony of the Witness.**

8. Before a witness can be impeached, under Section 864, L. O. L., there must appear in his evidence something inconsistent with the statement said to have been made by him at some other time and place, and he cannot be impeached on some utterance not thus relating to his testimony.

**Witnesses—Cross-examination may Show Hostility of Witness.**

9. Under Section 704, L. O. L., it is competent on cross-examination to ascertain the mental attitude of a witness toward the defendant, whether of enmity, hostility or prejudice, and he may be asked if, at other times, specifying time, place and persons present, and the particular language used, he has not made statements indicative

of hostility towards the party against whom he has been called as a witness.

### Criminal Law—Cross-examination to Impeach by Inconsistent Statements cannot be Justified on Ground That it Shows Bias and Prejudice.

10.   When counsel informs court that he is proceeding to impeach the witness by inconsistent statements, he must adhere to that theory, and cannot justify examination on the ground that it is proper cross-examination for purpose of showing bias or prejudice, as a party cannot mislead the court and invite error.

### Homicide—Turning of Bucks into Flock of Sheep not a Felony, Justifying Homicide.

11.   In prosecution for homicide, committed after dispute as to use of land for grazing purposes, testimony as to the effect of turning a band of bucks into defendants' flock of sheep *held* inadmissible, since, even if deceased had been in the act of so doing, it would not have been a felony on defendant's property, justifying homicide.

### Witnesses—Redirect Examination of Character Witnesses as to Defendant's Violation of Law Held Proper.

12.   In homicide prosecution, where witnesses for state had testified as to the bad reputation of one of the defendants, and on cross-examination had admitted that the basis of their estimate of his reputation was some trouble he had had, redirect examination by state, eliciting that the trouble referred to involved a violation of law, *held* proper, having been brought on by defendants' cross-examination.

### Homicide—Evidence as to Deceased's Reputation Held Competent.

13.   In homicide prosecution, evidence that deceased's general reputation was that of a peaceable, law-abiding citizen *held* competent, to refute assertion that he was about to commit a lawless act at the time of the killing.

### Criminal Law—Evidence of a Conversation Five Days Before Killing Held not Admissible as Res Gestae.

14.   In prosecution for homicide committed as the result of a dispute in regard to the use of land for grazing, evidence as to a conversation between an employee of the deceased and a brother of one of the defendants five days before the killing *held* not admissible as a part of the *res gestae.*

### Criminal Law—Instruction on Circumstantial Evidence Improper, Where Direct Evidence of Corpus Delicti.

15.   If there is any direct testimony respecting the *corpus delicti*, an instruction on circumstantial evidence is properly refused.

### Criminal Law—Instructions to be Directed to All of Legitimate Testimony.

16.   The court is required to frame its instructions, so that the attention of the jury shall be directed to all of the legitimate testimony, not excluding any particular part.

Homicide—Instructions on Apparent Danger Held Favorable to Defendants.

17. In homicide prosecution, defended on ground of self-defense, instructions on apparent danger *held* favorable to defendant.

Homicide—Apparent Danger must be Considered from the Standpoint of a Reasonable Man.

18. The question of apparent danger must be considered from the standpoint of a reasonable man in the plight of the defendants at the time of the killing, under all the conditions then surrounding the parties as .disclosed by the testimony.

Homicide—Instruction Requiring Apparent Danger to be Absolutely Established Held not Objectionable.

19. In homicide prosecution, instruction that apparent danger must be danger so urgent that the killing is "absolutely or apparently absolutely, necessary," *held* not objectionable as against contention that it required the danger to be mathematically established.

Indictment and Information—Facts to be Alleged in Direct Language Without Uncertainty.

20. Facts constituting the offense must be alleged in direct and positive language, without equivocation or uncertainty.

Criminal Law—Evidence Required to Prove Charge Merely Beyond Reasonable Doubt.

21. The evidence for the prosecution need not go further than to convince the jury beyond a reasonable doubt, to a moral certainty, of the truth of the charge.

Homicide—Defendant, Claiming Self-defense, Required Merely to Raise a Reasonable Doubt.

22. In prosecution for homicide, where defense was that there was either actual or absolute danger, or the reasonable appearance of such danger against which defendant acted in self-defense, he was not required to prove such defense to a mathematical certainty, but merely to raise a reasonable doubt of his guilt in the minds of the jurors.

Homicide—No Accessory Before Fact in Case of Manslaughter Committed in Heat of Passion.

23. There can be no accessory before the fact in a case of manslaughter by one acting on a sudden heat of passion, though more than one person may be actuated at the same time by a sudden heat of passion caused by a provocation applicable to all of them, apparently sufficient to make the passion irresistible, so that both will be guilty of manslaughter.

Homicide—Evidence Sufficient to Sustain Conviction of Two Defendants for Manslaughter.

24. In homicide prosecution, *held*, on appeal from conviction of two defendants for manslaughter, that the evidence was sufficient to

warrant jury in concluding that both defendants had been actuated by a sudden heat of passion and had fired at deceased at the same time.

### Homicide—Instruction on Justifiable Homicide Held Proper.

25. In prosecution for homicide, committed as the result of a dispute concerning use of land for grazing of sheep, the giving of an instruction that homicide is justifiable when committed to prevent the commission of a felony on the property of person who does killing, or on property in his possession, or in any dwelling-house where such person may be, *held* proper under the evidence.

### Homicide—Instruction on Justifiable Homicide Held Harmless.

26. In prosecution for homicide, committed as the result of a dispute concerning use of land for grazing of sheep, instruction that homicide is justifiable when committed to prevent commission of a felony on property of person who does killing, or on property in his possession, or in any dwelling-house where such person may be, if error, *held* not ground for reversal on defendants' appeal, being favorable to defendants.

### ON PETITION FOR REHEARING.

### Criminal Law—Guilt or Innocence a Question for Jury.

27. The question of defendant's guilt or innocence is exclusively for the jury; the Supreme Court's only duty on appeal being to ascertain whether there was sufficient evidence to carry the case to the jury.

### Homicide—Whether Defendant had Fired Shot, or Been Mere Bystander, Held for Jury.

28. In a homicide prosecution, involving the issue of whether defendant had been a mere bystander, or had fired one of the shots that had struck deceased, evidence *held* sufficient for submission to the jury of the guilt or innocence of such defendant.

### Homicide—Defendant Guilty of Manslaughter, Though Shot was not Necessarily Fatal.

29. A defendant who fired one of the shots that struck deceased, is guilty of manslaughter, under Sections 1897, 1902, L. O. L., where such shot contributed to deceased's death, though the shot was not necessarily fatal, and though the shot fired by other defendant was necessarily fatal.

### Homicide—Evidence Held to Make Self-defense a Question for the Jury.

30. In a homicide prosecution, involving self-defense issue, evidence *held* sufficient for submission to the jury.

### Criminal Law—Question on Which Evidence is Conflicting is for the Jury.

31. Where the evidence was conflicting, the question of defendant's guilt or innocence was for the jury.

**Homicide—Evidence That Body Could have Been Moved Without Leaving Footprints Held Admissible.**

32. In homicide prosecution, where it was claimed that defendants had moved decedent's body subsequent to his death, but there were no footprints surrounding the body, where it lay when the officers arrived, evidence that the body could have been moved without leaving such footprints *held* admissible.

**Criminal Law—Exclusion of Evidence not Considered in Absence of Answer and Specification in Brief.**

33. Refusal to permit answer to question will not be considered where record does not disclose answer witness would have given, if permitted to testify, and where appellant fails to point out in his brief wherein he was injured by the refusal to permit witness to answer.

**Homicide—Decedent's Peaceableness Admissible, Where Character Assailed.**

34. The state cannot, as a part of its primary case, offer evidence concerning decedent's reputation as a peaceable and quiet person, but generally can offer such evidence in rebuttal, if decedent's character for peaceableness is assailed by the accused.

**Homicide—Where Self-defense is Pleaded, State may Show Decedent's Peaceableness.**

35. In a homicide prosecution, the plea of self-defense, with evidence tending to support it, *held* a sufficient attack on decedent's character for peace and quiet to entitle the state to submit rebuttal evidence of his good reputation for peaceableness.

**Criminal Law—Error not Listed Among Assignments not Considered.**

36. Alleged error not listed among the assignments of error will not be considered.

**Criminal Law—Defendant's Reputation Confined to Trait Involved in Offense Charged.**

37. Generally, evidence as to defendant's reputation must be confined to the trait involved in the crime charged.

**Witnesses—Cross-examination as to Defendant Being Charged With Theft Held Proper.**

38. In homicide prosecution, where character witness for defendant had testified on direct examination that defendant's reputation was that of a law-abiding citizen, cross-examination as to defendant having been charged with theft *held* proper.

**Criminal Law—Appellants cannot Complain of Testimony, in Absence of Motion to Strike or Objection.**

39. Appellants cannot complain of admission of testimony to which they did not object, and which they did not move to have stricken.

Criminal Law—Homicide—Rule That Assignments not Argued are
　Waived Disregarded in Homicide Prosecution.

40.　Generally, assignments of error not argued by appellant will
be treated as having been waived, but such rule will be disregarded
in homicide prosecutions, since in such cases the liberties of the
defendants are involved.

SECOND PETITION FOR REHEARING.

Criminal Law—Distance of Witnesses from Scene Does not Make
　Testimony Circumstantial so as to Require Instruction Thereon.

41.　The fact that witnesses who testified to seeing the peti-
tioning defendant raise his arm and shoot were so far from the
scene of the shooting that they could hear none of the conversa-
tion between the parties does not make their testimony circumstan-
tial, so as to entitle that defendant to an instruction as to con-
viction on purely circumstantial evidence.

From Klamath: DELMON V. KUYKENDALL, Judge.

In Banc.

Under an indictment charging them with the crime
of murder in the second degree by killing O. T. Mc-
Kendree, the defendants were convicted of man-
slaughter, dissatisfied with which, they appeal.

AFFIRMED.

For appellants there was a brief over the name of
*Messrs. Renner & Chastain,* with an oral argument by
*Mr. W. H. A. Renner.*

For the State there was a brief over the names of
*Mr. W. M. Duncan,* District Attorney, *Mr. W. S.
Wiley,* Deputy District Attorney, *Mr. W. Lair Thomp-
son* and *Mr. Thomas Drake,* with oral arguments by
*Mr. Duncan* and *Mr. Thompson.*

BURNETT, J.—The scene of the homicide de-
scribed in the indictment is Dry Prairie, a plateau
approximately four or five miles square, in Klamath
County. There are some ridges in the plain, and it

is surrounded by wooded hills. In the immediate vicinity of the killing, tussocks of short grass were growing in a sandy soil, about six inches apart on the average. It was a suitable place for keeping sheep during the lambing season. The decedent was the owner of a band of about 2,500 sheep, in charge of a Spaniard named Jim Santiago, who, it appears, claimed a one-fourth interest therein under a contract for the purchase of the same from the decedent, and for which he had not yet completed the payment. It is claimed on behalf of the prosecution that Santiago had gone into Dry Prairie several days prior to the homicide, and likewise before the advent of the defendants with another band of sheep owned by the defendant, Holbrook, and his brother, and accompanied by Paddock as an employee of the Holbrooks.

It is contended by the defendants that, as they approached the prairie from the southeast over the adjacent hills, they had a full view of the valley and saw no sheep there at all. It soon developed, however, that Santiago was there with sheep, and some discussion took place between himself and the defendants from time to time about his rights there. During their interview Paddock asserted control of the land where Santiago was then camped, whereupon the latter on the next day moved his camp farther north and established it on a portion of the public domain. Meanwhile, the defendants had made their camp, consisting of two tents facing eastward, at a point approximately 1,900 feet south, 35° 25′ west from the camp of Santiago, as the latter was last established.

It seems that, when Santiago learned of the coming of the defendants and of their claim to the grazing on the prairie, he sent word to McKendree, who was

then at Klamath Falls, about 30 miles distant. Mc-Kendree came to Dry Prairie on the morning of April 20, 1918. At that time his sheep were in the western part of the prairie, south of some springs near which were some shearing corrals. He went there and found Santiago. All this time McKendree was riding on a white horse and was armed with a repeating rifle. He returned with Santiago, traveling in an easterly direction towards the latter's camp. On arriving at a point approximately north of the camp of the defendants, described by Santiago as "about half of a quarter of a mile" away, they separated, Santiago going towards his own camp, and the decedent riding directly to the camp of the defendants.

Digressing here, it is contended by the defendants and their witnesses that the decedent came to their camp before going west to the springs. On his arrival at their tents, as they state, he quarreled with them and called them vile names, threatening to "blow their caps off," leveling his rifle at them and compelling them to come out from their tent at the point of his gun, and demanding that they leave the prairie. He had dismounted, as they say, and at this juncture his horse broke away from him, whereupon he pursued on foot and caught it, some distance east of their tents. He there mounted the horse and proceeded on a northwesterly course towards the springs already mentioned, calling out to them as he passed that, if he caught either of them he would beat him so his mother would not know him. He then went on in that direction, and later returned, as already stated, making the first time he appeared at their camp according to the theory of the prosecution, and

the second time as the defendants assert. They say
that he rode up and renewed the quarrel, demanding
that they leave, claiming that there was not room
enough in the prairie for two bands of sheep. Pad-
dock contended, according to the defendants' story,
that he had before that kept sheep there through the
lambing season when other bands were there, insist-
ing that he had a better right there than anyone else,
on account of having filed an application for a stock-
raising homestead under the act of Congress of De-
cember 29, 1916 (U. S. Comp. Stats. 1918, U. S.
Comp. Stats. Ann., Supp. 1919, §§ 4587A–4587K;
Fed. Stats. Ann., Supp. 1919, pp. 708–711), entitled
"An Act to provide for stock-raising homesteads,
and for other purposes."

Among other things attributed to the deceased by
the defendants in that altercation was a statement by
McKendree that he was going to turn into the valley
600 bucks and that Holbrook would have to herd
them. They ascribe to him various threats of per-
sonal violence as he sat on his horse. At this time
Holbrook was inside of or in the entrance to the
larger tent of the two and Paddock was outside, some
20 or 30 feet distant, near a wagon standing there.
The defendants say that McKendree rode his horse
against Paddock and forced him back several steps,
and started to raise his gun, when Holbrook fired
two shots in quick succession from a rifle which
he had in hand at the time, all while McKendree
was facing him. Frightened by the shots, the horse
whirled and started towards the Santiago tent
and McKendree fell off. One of the shots passed
through his body, entering the chest above the
heart, severing the aorta and the vena cava, and
lodged in the muscles of the back after fracturing the

fifth and sixth ribs. This shot was shown to be by a soft-nosed bullet which, as some witnesses described it, practically exploded inside the body after striking some bones. The defendants contend that Holbrook fired both shots and that Paddock was not armed and did not shoot at all. They maintain that he was an innocent bystander.

The direct testimony for the state as to the killing itself comes from Santiago and another Spaniard named Emanuel Garcia. The former narrates that, acting under directions of McKendree after separating, he shouted to Garcia, who was at the Santiago tent, to get a saddle-horse for him, as he was going to accompany McKendree some seven or eight miles away to find new pasture for their sheep. He says that he watched McKendree continually as the latter rode towards the tents of the defendants and until he was killed; that the deceased rode up in front of the two tents occupied by the defendants and dismounted; that after some ten minutes' conversation which Santiago could not hear from his distance, McKendree remounted his horse and started to turn to the right, when one shot was fired from the larger tent; and that, as the horse whirled and started to run in fright, the other defendant, who had stood outside the tent participating in the conversation, fired another shot with a pistol. Medical men who were witnesses for the state testified in substance that there was a gunshot wound entering from the back of the deceased, fracturing the neck of the shoulder-blade and passing through the body upward at an angle of about forty-five degrees, the exit being just under the collar-bone, making a clean-cut wound through the body.

Garcia declares that, having heard the shouted orders of Santiago he left his camp and went to get Santiago's horse, traveling approximately southeast until he arrived at a point, as shown by the maps introduced, almost due east from the tents of the defendants, at a distance of 2,550 feet. He describes the occurrences after McKendree arrived at the defendants' camp substantially as related by Santiago, and particularly the fact that the man outside the tent fired a pistol shot immediately after the fatal shot, and as the horse turned to run. Santiago, as he says, mounted his horse as soon as he could saddle it, rode some miles to a telephone and gave information of the homicide to the deputy sheriff. Some of the party of employees with the defendants did the like.

It is in testimony that individuals who arrived there some two hours after the killing were not permitted to go near the body, but were invited to sit down in the larger tent, and were cautioned by the defendants not to disturb two empty cartridge shells that were lying in front of the tent. The defendants claimed not to have touched the body or to have gone near it, or disturbed anything on the scene, from the time McKendree fell from his horse.

The medical experts declare that the wound severing the blood vessels mentioned was instantly fatal, and that the wound through the shoulder-blade would at once disable that arm, so that it would be incapable of holding or carrying a rifle. A witness for the state, who was the first to arrive there of anyone except the defendants and their employees, but who claimed that his eyesight was not very good, came near the defendants' tents and was told by them that there was a dead man there, but that they said, "we will not say who killed him." The witness claims to

have looked casually in the direction of the dead
body, and to have seen that it was lying on its back,
with its right leg bent, with the knee upward and a
gun lying on the west side, with the butt northeast
and the barrel west, and that the body was about ten
steps away from the tent. Other witnesses, who
came later described the corpse as lying 96 feet away
from the larger tent and 80 feet from the smaller one,
and exhibit photographs showing that it was lying on
its back, with the left leg extended on a line with the
body, and the right leg lying full length at an angle,
as if the feet were spread apart. The right arm was
extended flat on the ground to the right, at right
angles with the body, and the left arm bent up, with
the hand resting approximately on the left collar-
bone. As shown in the photographs, the butt of the
gun rested on the ground at the left side of the body,
and the barrel lay against the body approximately at
the left nipple, projecting above the chest at an angle
of about 45 degrees.

The witnesses for the state testify that, in addition
to the two rifle shells found immediately in front of
the larger tent, there was also discovered an empty
shell from a Luger pistol some ten feet farther away
towards the wagon, and that when the coroner ar-
rived a pistol of that make was produced by one of
the defendants from the seat of that wagon from
under a covering canvas. One of the witnesses for
the state testified that on examination this pistol
seemed to have been recently fired, but that its maga-
zine was full of cartridges. It is a contention of the
state that between the time of the killing and the
advent of the officers the defendants had moved the
body and had so arranged it as to give rise to infer-
ences favorable to themselves. There was testimony

to the effect that there were no footprints near the body as it lay in the position shown in the photographs, but that there were some at the point where the tracks of the horse show he had whirled in his fright. In connection with that matter, the state put in the testimony of two witnesses to the effect that ten days after the homicide, and while the conditions were the same as on the day of the killing, they had made experiments in walking about on the tussocks of grass already mentioned, to see if they would make tracks, and they stated that, although they watched each other while thus engaged, they could not discover that any visible track was made.

· It is said by the defendants, in substance, that immediately after the shots which were fired at McKendree a rifle shot was fired in their direction from the Santiago tent, and that they saw the smoke of the shot, and saw Santiago dodging behind his tent. During the trial at Klamath Falls, witnesses for the state took cartridges of the kind found in Santiago's gun, and went out to a plain near Klamath Falls, where there was a background of green timber in the distance, and fired several shots in the presence of observers stationed at substantially the same distance away as between the two camps already mentioned, and they testified that there was no smoke visible. The admission of testimony about these experiments is assigned as error.

It is claimed by the defense that McKendree and Santiago, in going from the springs in the northwest part of the prairie eastward towards the camp of the latter, passed a witness named Blodgett and another man named Barclay Holbrook, who were in the employ of the defendants. On cross-examination, Santiago was asked to tell what was said between Blod-

gett and McKendree. He stated in substance that
Blodgett sought employment of McKendree, who told
him when he finished his work for the defendants to
come to him and he would give him employment.
Later on in the trial the state sought to introduce
some declarations of McKendree, made prior to his
turning south to the defendants' camp. On objec-
tion of the defendants to this testimony as not being
part of the *res gestae,* the court excluded it, and
stated in substance that he would not permit any-
thing to go in as *res gestae* occurring prior to the
time that McKendree separated from Santiago and
turned south to the Holbrook camp.

As part of their defense, the defendants called as
a witness an abstractor and sought to have him tes-
tify about his examination of the county deed records,
and to state what they disclosed about land owned by
the defendant Paddock. The state objected to this as
to any other lands than that where the homicide oc-
curred, and contended that the evidence offered was
not competent to show title, but conceded that the de-
fendants could show title in one of them to the land
on which the killing occurred. Nothing further, how-
ever, seems to have been attempted along this line.
This ruling was also objected to by the defendants.
They also offered to show by Mrs. Fordney that on
the day next prior to the homicide, while en route
from Klamath Falls to where he was killed, Mc-
Kendree called upon her and endeavored to lease
from her for grazing purposes some land which he
thought she owned in Dry Prairie, but on being in-
formed that she had previously sold it, he appeared
to be angry. This offer was rejected and the defend-
ants assign error on the refusal.

After Santiago had been dismissed from the witness-stand at the close of his cross-examination, the defendants recalled him for further cross-examination. As the counsel was proceeding to interrogate him, the court inquired if the defendants were laying a foundation for an impeaching question. Being answered in the affirmative, the judge informed counsel of a rule of court that impeaching questions should be in writing and a duplicate furnished to the court. The witness was then dismissed temporarily, and later they propounded a question which, eliminating profanity and obscene epithets said to have been applied to the defendants, reads thus:

"Did you not, on the public road leading from Bonanza to Bly, in Klamath County, Oregon, on the afternoon of April 17, 1918, say to Henry C. Lemler, 'I am in trouble. You know Holbrook and Paddock (or Maddock) got six hundred acres say he got sixteen hundred acres. I see Mr. McKendree and he shoot them (or sue them) and get it all. I know McKendree he fix them plenty,' or words to that effect?"

The court sustained objections to this question and refused to permit Santiago to answer the same, and later would not allow Lemler to answer it, all of which is assigned as error. The defendants also complained that the court would not permit a witness called by them to testify as to the result of turning 600 bucks into a flock of lambs and ewes.

The defendants offered testimony of several witnesses to the effect that the reputation of the defendant Holbrook for being a peaceable, law-abiding citizen was good. In rebuttal the state offered the testimony of a number of witnesses to the effect that he was of ill repute in that respect. Cross-examining the state's witnesses, the defendants elicited from

some of them that the basis of their estimate of his reputation was some trouble he had had about some sheep, and on redirect examination of those witnesses in some instances the state brought out that the trouble involved a violation of law. It is assigned as error that the court permitted the state to give evidence to the effect that the deceased had the reputation of being a peaceable, law-abiding citizen, and they complain that the court would not allow them to put in evidence a conversation which occurred between a brother of the defendant Holbrook and the witness Santiago on Monday, April 15th, before the killing on Saturday, April 20th. No offer of what the witness would testify in answer to such questions was made.

In respect to instructions asked and refused the assignment of error is couched in this language:

"The court erred in refusing to give and ignoring all the instructions offered at the trial, on behalf of both the plaintiff and defendants, and on its own motion gave instructions; in doing so the court assumed the burden and responsibility to give all the law absolutely correct; and the court under such circumstances would not be permitted to in the least jeopardize the interests of the defendants, and having failed to give all the law correctly, it committed grievous error to the prejudice of the defendants. * *

"The court further erred in the law in this case in refusing to give all of the defendants' instructions; and it further erred in refusing to give any of defendants' instructions, especially instruction No. 10. And the court erred in giving instruction on its own motion and without request, that is not the law in the case on abstract propositions of law not based upon evidence in the case to support them, and the instructions of the court were given in the negative, vague and ambiguous and as a whole series

were misleading to the jury, conveying an impression upon the jury, the idea that someone must be convicted of some crime * * "

In general terms, without specifying any particular part of the charge, the defendants claim that the court erred in submitting the question of manslaughter to the jury. They maintain that the "instant case is either murder or justifiable homicide," and they urge that there was no evidence from which the jury would be authorized to return a verdict of manslaughter in any event. Specifically, they assign as error the following excerpts from the charge to the jury:

1. "You will understand from this that you may find one defendant guilty and the other not guilty, or you may find both guilty but in different degrees; that is, your verdict need not be the same for both defendants."

They insist that the court thereby told the jury that it must find one of the defendants guilty.

2. In charging the jury that justifiable homicide is the taking of human life in self-defense "to prevent the commission of a felony on the property of such person, or upon property in his possession, or upon or in any dwelling-house where such person may be."

3. In eliminating the principle of apparent danger, in this language: "And had reason to believe that his life was in danger, or that he was in danger of great bodily harm. To excuse homicide, the party must act under an honest belief, well founded that it is necessary to take life to prevent great bodily harm."

4. Exception is taken to this language: "It must be danger so urgent that the killing is absolutely or apparently absolutely necessary, and the danger must not have been brought on by the slayer."

In general terms, without specification of the particular language to which the defendants object, it is assigned as error, in substance, that the court was wrong in instructing the jury as to the law applicable to aiders and abettors, contending that "such instruction was an abstraction, and without evidence to warrant a jury to find the defendants guilty of manslaughter," on the ground, as defendants argue, "that there can be no accessories to voluntary manslaughter."

1, 2. Concerning the experiments about tracing footprints on the grass at the scene of the homicide, and whether or not smoke could be seen from the discharge of a rifle loaded with a certain kind of cartridge, it is enough to say that, as stated by Mr. Justice LORD in *Leonard* v. *Southern Pacific Co.,* 21 Or. 555 (28 Pac. 887, 15 L. R. A. 221):

"In all cases of this sort, very much must necessarily be left to the discretion of the trial court; but when it appears that the experiment or demonstration has been made under conditions similar to those existing in the case in issue, its discretion ought not to be interfered with."

As to the tracking experiment, the preliminary testimony was to the effect that the conditions were substantially the same as on the day when the killing occurred, and there is no testimony in the record to dispute this basis for the experiment. As to the ability to see smoke from a discharge of a rifle, the evidence was to the effect that the cartridges were charged with what is known as smokeless powder, and were of the same kind as those with which Santiago's gun was loaded, and that on both days, that of the homicide and that of the experiment, the atmosphere was clear and the background was similar, so that the

court was well within its discretion in allowing the testimony relating to both experiments. The objections of the defendants go more to the weight of the experiment testimony than to its competency. The question has been considered lately in the case of *Kohlhagen* v. *Cardwell*, 93 Or. 610 (184 Pac. 261), in an opinion by Mr. Justice BENNETT, where the authorities are reviewed, constituting the latest expression of this court on that subject.

3, 4. As already noted, the testimony of Santiago about the conversation between Blodgett and the decedent related only to negotiations about the employment of the former by the latter. It was immaterial matter, brought out on cross-examination, and, besides this, there was no offer, as disclosed by the record, to show what Barclay Holbrook would testify on this point. The ruling of the court in this instance was not erroneous, nor was it wrong to reject the proffered testimony of the abstractor about his examination of the records with regard to what they showed about the ownership of lands by the defendant Paddock, especially in the light of the concession of the state, by its counsel, that the defendants might show title, if they could, in either of them to the land on which the homicide occurred.

5. The appearance of anger on the part of the decedent on the day previous to the homicide, when he learned that Mrs. Fordney could not lease the land to him, because she had sold it, is something utterly foreign to the issue in hand, and was properly excluded from the testimony.

In respect to the question propounded to Santiago about what he said to Lemler on April 17th when he was going towards Bly, which question the court refused to allow either Santiago or Lemler to answer,

we remember that, as shown by the record, counsel for the defendants stated to the court that they asked the question to lay a foundation for the impeachment of Santiago. There are two methods described by our Code by which a witness can be impeached:

"A witness may be impeached by the party against whom he was called, by contradictory evidence, or by evidence that his general reputation for truth is bad; or that his moral character is such as to render him unworthy of belief, but not by evidence of particular wrongful acts, except that it may be shown by the examination of the witness or the record of the judgment that he has been convicted of a crime": Section 863, L. O. L.

"A witness may also be impeached by evidence that he has made, at other times, statements inconsistent with his present testimony; but before this can be done, the statements must be related to him, with the circumstances of times, places, and persons present; and he shall be asked whether he has made such statements, and if so, allowed to explain them. If the statements be in writing, they shall be shown to the witness before any question is put to him concerning them": Section 864, L. O. L.

"Impeach" is a statutory word, and if a party would thus attack the testimony of an adverse witness, he must pursue the statutory method: *State v. Askew*, 32 Idaho, 456 (184 Pac. 473). It is manifest that the effort to impeach Santiago cannot be classified under Section 863, L. O. L. There is no attempt in the record to show that his general reputation for truth is bad, or that his moral character is such as to render him unworthy of belief, and evidence of any particular wrongful act on his part would be excluded under the terms of that section. The attempt to impeach him is therefore confined to the requirements of Section 864. In other words, it

would be necessary to show by the impeaching question that he had "made at other times statements inconsistent with his present testimony."

7. The testimony of Santiago included a narration of the occurrences as he viewed them on the day of the homicide, and that he was on Dry Prairie with the McKendree sheep before the arrival of the defendants with the flock in their charge. The profanity and obscene epithets applied to the defendants, as indicated in the proposed impeaching question, were not inconsistent with any recital of his as a witness. There is no indication, in what he said in testifying, that he pretended to be friendly to either of the defendants. Indeed, he says of his conversation with one of them that they were both somewhat angry, and there is nothing at variance with that attitude as disclosed in the impeaching question. His declarations about what McKendree would do could not bind the latter: *State* v. *Burns,* 25 S. D. 364 (126 N. W. 572); *People* v. *McBride,* 120 Mich. 166 (78 N. W. 1076); *Menges* v. *State,* 25 Tex. App. 710 (9 S. W. 49); *United States* v. *Cohn,* 128 Fed. 615. Moreover, Santiago made no mention of that matter in his testimony.

8. As governed by the statute, before a witness can be impeached under Section 864, there must appear in his evidence something inconsistent with the statements said to have been made by him at some other time and place. He cannot be impeached on some utterance not thus related to his testimony in the case. We remember, indeed, that:

"A witness is presumed to speak the truth. This presumption, however, may be overcome by the manner in which he testifies, by the character of his testimony, or by evidence affecting his character or mo-

tives, or by contradictory evidence. * * '' Section 704, L. O. L.

9, 10. Under this section it is competent on cross-examination to ascertain the. mental attitude of the witness towards the defendant, whether of enmity, hostility or prejudice. As the rule is stated in such cases as *State* v. *Stewart,* 11 Or. 52 (4 Pac. 128), *State* v. *Ellsworth,* 30 Or. 145 (47 Pac. 199), and others, he may be asked for this purpose if at other times, specifying time, place and persons present and the particular language used, he has not given voice to utterances indicative of hostility towards the party against whom he has been called as a witness. The procedure for eliciting such statements for the purpose of showing the hostility of the witness is the same as that to be employed in bringing out inconsistent statements; but the purpose of the two is entirely different. One is to discredit the motives of the witness, and the other is to put in operation the formula laid down by the statute for his impeachment. The latter does not necessarily imply hostility. The two are not to be confounded, and when the defendant by his counsel informs the court that he is proceeding to impeach the witness, he must adhere to that theory. He is not entitled to mislead the court and invite error. He cannot in one breath contend that he is proposing to impeach the witness, and in the next say that he was endeavoring to show bias or prejudice. As an effort to impeach the witness Santiago, the question propounded was clearly inadmissible, and the defendants were not entitled to follow it up by the testimony of Lemler to the effect that Santiago made the statement thus attributed to him.

98 Or.—5

11. It is not pretended that the decedent was in the act of turning a band of bucks into the flock of the defendants, and even if such were the case, it would not be a felony upon the defendants' property in any event, justifying homicide in the defense of it. Hence, the court was right in not permitting the defendants' witness to testify about the effect of such an action.

12. The matter upon which the character witnesses on the part of the state, who testified against the reputation of the defendant Holbrook, based their opinion, was brought out on cross-examination by defendants' counsel, and cannot be complained of by them.

13. A defense urged by Holbrook and Paddock was substantially that McKendree was about to commit a felony upon them, by shooting them with his rifle. It was competent to show that McKendree's general reputation was good for being a peaceable, law-abiding citizen. This would have a tendency to refute the assertion that he was about to commit a lawless act. In a sense, it was an issue whether or not McKendree was about to violate the law, and his reputation above mentioned would tend to disprove that charge. In principle it is the same as the testimony adduced by the defendants in their own favor on the same feature.

14. The conversation between Letcher Holbrook and Santiago on the Monday previous to the killing was not part of the *res gestae*. No foundation was laid for impeaching Santiago in that matter. Neither was there any offer on the part of the defendants to show what Letcher Holbrook would have testified, had he been permitted to speak on that subject.

The tenth request of the defendants to instruct the jury, upon the refusal of which they predicate error, reads thus:

"In this case some of the conclusions sought to be established by the state depend upon what is known in law as circumstantial evidence. To warrant a conviction on circumstantial evidence, to justify any conclusion leading to conviction, every single fact essential to such a conclusion must itself be proved by competent evidence beyond a reasonable doubt, and all the facts necessary to establish such a conclusion must be consistent with each other and with the conclusion sought to be established, and all the circumstances taken together must be sufficient to establish that conclusion, and to produce reasonable and moral certainty that it is true. No person can be convicted on circumstantial evidence, unless each circumstance essential to the conclusion of guilt is itself established to the satisfaction of the jury and beyond a reasonable doubt, and all of these circumstances, taken together, must produce a reasonable and moral certainty in the mind of the jury that the conclusion sought to be established is true. The mere union or combination of any number of independent circumstances each of an imperfect and inconclusive character will not justify a conviction, but, on the contrary, they must be such as to generate and to justify full belief beyond reasonable doubt of the guilt of the defendant. It is not sufficient that the circumstances proved coincide with, or render probable, the guilt of the defendant, but they must exclude every other reasonable hypothesis. No probability, nor any number of probabilities, nor any degree of probability, will be sufficient, for nothing short of proof beyond reasonable doubt of the guilt of the defendant is sufficient to justify his conviction. No other conclusion but that of the guilt of the defendant must fairly and reasonably arise from, or grow out of, the evidence, and the facts established must be absolutely incompatible with innocence, and incapable of explanation upon any other rational

hypothesis than that of guilt, or the defendant must be acquitted.''

In *Blanton* v. *United States,* 213 Fed. 320 (Ann. Cas. 1914D, 1238, 130 C. C. A. 22), the court used this language:

''The most serious complaint is of a denial of a request respecting circumstantial evidence, which was not correctly covered by the general charge. We think, however, the denial was right. After the first few words, the request proceeded on the erroneous assumption that the evidence against the accused was entirely circumstantial, speaks of the strength of such evidence essential for conviction, and says it should always be cautiously considered. A requested instruction is always properly refused, unless it ought to have been given in the very terms in which it is proposed: *Brooks* v. *Marbury,* 11, Wheat. 78 (6 L. Ed. 423). An instruction as to evidence which would have a tendency to direct the minds of the jury from the controlling effect which other proper evidence may have on their decision should be refused: *Ayers* v. *Watson,* 137 U. S. 594 (34 L. Ed. 803, 11 Sup. Ct. Rep. 201). A court may properly decline to give an instruction which would tend to mislead the jury: *Agnew* v. *United States,* 165 U. S. 36 (41 L. Ed. 624, 17 Sup. Ct. Rep. 235, see, also, Rose's U. S. Notes). A request to instruct the jury upon a part only of the testimony is objectionable: *Smith* v. *Condry,* 1 How. 28 (11 L. Ed. 35).''

15. By the great weight of authority the doctrine of, the cases is that an instruction on circumstantial evidence, such as the defense propounded in the instant case, is proper only when the prosecution relies exclusively on that class of testimony. On the other hand, if there is any direct testimony respecting the *corpus delicti,* an instruction on circumstantial evidence is properly refused. To give such a direction,

where direct testimony is in the record would tend largely, in effect, towards saying to the jury:

"You may lay aside for the present all direct testimony respecting the crime charged, take up the circumstantial evidence, and, if you find that no other reasonable conclusion than the guilt of the defendant can be derived from such circumstantial evidence, you may find him guilty; otherwise, you must acquit him."

16. This would be a partial and biased view of the case. The court is required to frame its instructions so that the attention of the jury shall be directed to all of the legitimate testimony, not excluding any particular part. The text in 16 C. J. 1008, lucidly explains the proposition. See, also, the following precedents: *People* v. *Raber,* 168 Cal. 316 (143 Pac. 317); *People.* v. *Lonnen,* 139 Cal. 634 (73 Pac. 586); *State* v. *Link,* 87 Kan. 738 (125 Pac. 70); *State* v. *Calder,* 23 Mont. 504 (59 Pac. 903); *State* v. *McKnight,* 21 N. M. 14 (153 Pac. 76); *Foster* v. *State,* 8 Okl. Cr. 139 (126 Pac. 835); *Brannon* v. *State,* 149 Ga. 787 (80 S. E. 7); *People* v. *Dougherty,* 266 Ill. 420 (107 N. E. 695); *People* v. *Bonifacio,* 190 N. Y. 159 (82 N. E. 1098); *State* v. *Neville,* 157 N. C. 591 (72 S. E. 798); *Barnard* v. *State,* 88 Tenn. 183 (12 S. W. 431).

This explicit direction appears in the charge to the jury:

"If you find from all the evidence that it has not been proved beyond a reasonable doubt that a defendant or defendants committed one of these crimes, then you will find such defendant or defendants not guilty."

The same principle is reiterated elsewhere in what the judge said in charging the jurors. In view of

such language, it cannot be said of a truth that he in anywise required the jury to find either or both of the defendants guilty.

In the main, the exceptions to the charge of the court to the jury are founded upon small excerpts from the body of the document; in some instances, on parts of a sentence. It is written large in the instructions that the defendants are entitled to act upon appearances of danger and are not confined to actual danger. For instance, the judge said to the jury:

"A person has a right to protect his life or his person from great bodily harm, and he may even go to the extent of repelling any attack upon him by using a dangerous weapon, if the same is necessary or apparently necessary, to save his own life, or his person from great bodily harm. The danger, in fact, need not be real, but only apparent, if the assailed at the time honestly believed, and had reason to believe, that his life was in danger, or that he was in danger of great bodily harm."

17, 18. So far as apparent danger is concerned, these instructions were as favorable as the defendants could ask. It might be remarked in passing that they were subject to objection on the part of the state in this, that they left the appearance of danger or actual danger to the judgment of the defendants, without regard to whether they were acting as reasonable men would under such circumstances, and in such a situation as the defendants were placed at the time. The law is that the matter must be considered from the standpoint of a reasonable man in the plight of the defendants at the time, under all the conditions then surrounding them, as disclosed by the testimony. The right to kill a human being in self-defense can-

not be committed to the judgment of an unreasonable man, whether actuated by anger or cowardice.

19. Based on the language of this court in *State v. Glass,* 5 Or. 73, and *State v. Caseday,* 58 Or. 429 (115 Pac. 287), the defendants object to this language of the trial judge:

"It must be danger so urgent that the killing is absolutely or apparently absolutely necessary, and the danger must not have been brought on by the slayer."

Disregarding the phrase "apparently absolutely necessary," the argument for the defendants is that the word "absolutely," as otherwise used in the excerpt just quoted, requires that the danger against which the defendants are entitled to act must be mathematically established, which would be to require of the defendants more than can be accomplished by any human being. In *State v. Porter,* 32 Or. 135, 157 (49 Pac. 964, 970), this court, speaking by Mr. Justice WOLVERTON, approved the instruction touching the law of self-defense to the effect that the danger "must be absolute, imminent, and unavoidable, or the defendant must, from all the circumstances, have honestly believed it to be so." The court there placed its approval of the instruction upon the ground that the language was coupled with the alternative expression about the belief of the defendant in the imminence of the danger, and drew the conclusion that, with this explanation, the jury could not have been misled by the language complained of. In *State v. Glass,* followed by *State v. Caseday,* the court condemned an instruction requested by the defendant that—

"The hypothesis contended for by the prosecution must be established to an absolute moral certainty,

to the entire exclusion of any other hypothesis being true, or the jury must find the defendant not guilty."

A similar request was denied in the Caseday case. The Porter case may be easily distinguished from those of Glass and Caseday.

20–22. The matter is best illustrated by an analogy. It is necessary for the state, in accusing a defendant of a crime, to allege the facts constituting the offense in direct and positive language without equivocation or uncertainty. So to speak, a mathematically certain declaration is required, but it is not demanded that in support of such an accusation the state must adduce a mathematical demonstration. The evidence for the prosecution need not go further than to convince the jury beyond a reasonable doubt, to a moral certainty, of the truth of the charge. On the other hand, in a sense, the defendant urges in his defense under the plea of not guilty that there was either actual or absolute danger, or the reasonable appearance of such danger, against which he acted in self-defense. The measure of proof required of him in such a case is not mathematical demonstration, but enough merely to raise a reasonable doubt of his guilt in the minds of the jurors. Where Glass and Caseday were involved, the subject under discussion was the *quantum* of proof; while as to Porter there was under consideration the ultimate fact in the alternative of actual, or, in other words, absolute danger, or the appearance of the same, towards which the defendant should direct his efforts in the matter of proof. There the measure of proof was not under consideration, as it was in the other two precedents. The present issue is governed by the doctrine of the Porter case. It is not within the reasoning of the opinions in either of the others.

''Absolutely'' is not an accurate expression as applied to the measure of proof, but is rightly predicated of an allegation. In some instances difficulty on the part of jurors in distinguishing between averment and proof in the employment of the word would suggest as safer the use of other language in instructions, so as not to stray too near the border line of error. It is clear that the defendants had the right to resist absolute danger if such there was. Further, they are favored with the right to oppose the reasonable appearance of such absolute danger. In each of the two instances the law sanctions a homicide absolutely or apparently absolutely necessary to repel the correlative danger. This is substantially what the trial judge told the jury in the instant case and he was right in his language.

Taken altogether, as it must be for the purposes of this opinion, the address of the court to the jury lucidly portrayed the doctrine of actual or apparent danger in terms quite as favorable as the defendants could ask. We are not called upon to dissect the instructions into detached portions, and base our decision solely upon those minute excerpts.

23. It is true as a principle of law that there can be no accessory before the fact in a case of manslaughter by one acting upon a sudden heat of passion. It is equally true, however, that more than one individual may be actuated at one and the same time by a sudden heat of passion caused by a provocation applicable to all of them, apparently sufficient to make the passion irresistible, and so kill another human being as, together, to be guilty of manslaughter.

24. The defendants contend that there is no evidence that Paddock fired a shot, or took any part in the

homicide, and that he is entitled to go free. This entirely ignores the testimony of Santiago and Garcia to the effect that they saw him fire a pistol in the direction of McKendree immediately after the shot by the rifle from the tent. It lays aside the testimony to the effect that, of the two wounds on the body of McKendree, one entered from the front and was caused by a soft-nosed bullet, which ruptured the blood vessels near the heart, broke the fifth and sixth ribs in the back, and lodged in the dorsal muscles; and another entered from the back and caused a clean-cut wound, which penetrated through the entire body, indicating that it was made by a steel-jacketed bullet, such as was found in the Luger pistol, in custody of the defendants. From the testimony the jury properly may have believed that fired by a sudden heat of passion at McKendree's abuse of them, repeated at short intervals, as they say it was, the defendants, acting together, both shot him, one with the rifle and the other with the Luger pistol.

25, 26. It was not error, harmful to the defendants, at least, for the court to direct the attention of the jury to the principle that homicide is justifiable when committed "to prevent the commission of a felony on the property of such person, or upon property in his possession, or upon or in any dwelling-house where such person may be." There was testimony to the effect that Holbrook fired the fatal shot from one of the defendant's tents. He claimed to have fired it to protect himself from a threatened assault by McKendree with his rifle, testifying that the defendants were living in that tent, at least temporarily. They ate and slept there while in charge of their flock, and they would have a right to defend that habitation under the statute from which the excerpt was taken,

whether it was a mere tent or a more pretentious abode. In *Hooper* v. *State* (Tex. Cr. App.), 105 S. W. 816, the court held that a tent was a private residence within the meaning of a statute against gambling "not in a private residence"; the fact being that the game was played in a tent owned by a saloon-keeper and occupied by an employee as a sleeping place. *Hipp* v. *State,* 45 Tex. Cr. Rep. 200 (75 S. W. 28, 62 L. R. A. 973), was another gambling case, apparently under the same statute. The card-playing was done in a tent formed by a wagon sheet over a pole, with brush for the sides and back and a brush fence in front to keep out the stock. One Scoggins and his son occupied this tent as a home, doing their cooking and sleeping there, and the court said:

"In our opinion, under the testimony the camp occupied by Scoggins and his son was their private residence; * * it was their home for the time being, and, under this evidence we are of opinion this was * * sufficient to show that this was a private residence."

In *Corey* v. *Schuster,* 42 Neb. 269 (62 N. W. 470), the question was about the occupation of realty as a homestead, and the opinion there held:

"The law does not contemplate, by the words 'dwelling-house' any particular kind of house. It may be a 'brownstone front,' all of which is occupied for residence purposes, or it may be a building, part of which is used for banking or business purposes, or it may be a tent of cloth."

See, also, *Killman* v. *State,* 2 Tex. App. 222 (28 Am. Rep. 432). In the light of the testimony, the defendants might well have contended that they killed the decedent to prevent the commission of a felony in their dwelling-house. In any event, the instruc-

tion could not have been harmful to them, because it provided for them another avenue of escape from the charge in the indictment.

From a careful and exhaustive examination of the record, having in mind the consequences that must be visited upon the defendants by a denial of their appeal, we are compelled to the conclusion that the case was fairly presented to the jury, without prejudice to any of their rights. By the resulting verdict of their countrymen, they have been declared guilty of the killing of a human being, and there is no alternative but to affirm the judgment.

AFFIRMED. REHEARING DENIED.

Mr. Justice BENSON did not participate in the hearing or decision of this case.

BENNETT, J., Dissenting.—I cannot quite agree with what is said in the opinion of Mr. Justice BURNETT as to the evidence of previous statements made by the witness Santiago, tending to show intense hostile feeling upon his part towards the defendants, which was offered for the purpose of impeachment.

As I read the opinion, there is no question made but what this evidence was admissible on behalf of defendant, for the purpose of discrediting the witness, if the attorney for the defendants properly stated the purpose for which it was offered. That it was so admissible for the purpose of discrediting the testimony of the witness is so well settled and so elementary as to be beyond question.

But, when this evidence was offered the attorney for defendant, in answer to an interrogatory by the court, stated that it was offered for the purpose of

"impeachment," and it is held in the opinion that the proper purpose of the testimony was to "discredit" rather than "impeach," and that therefore the statement that it was offered as an impeaching question was misleading to the court, and that there was no error in holding that it was inadmissible for that purpose. ·

I cannot see any difference upon which this distinction can be based. The very purpose of any impeachment is to discredit, and anything which discredits a witness, impeaches him to that extent. In other words, the terms "impeach" and "discredit," as we apply them to the evidence of a witness, mean, as it seems to me, exactly the same thing.

Webster's International Dictionary defines "impeach" in this sense as follows:

"To impute some fault or defect to, as bias, invalidity etc.; to bring or throw discredit on—to call in question—as to impeach one's motives or conduct. To challenge or discredit the credibility of, as a witness"—

and gives "discredit" as one of its synonyms. ·

Professor Wigmore, in his analytical and exhaustive work on Evidence, in the chapter on "Testimonial Impeachment," treats the proof of bias at considerable length, as one means of impeaching a witness. In one place in this chapter on "Impeachment," he says:

"But the force of a hostile emotion, as influencing the probability of truth telling, is still recognized as important, and a partiality of mind is therefore always relevant, as discrediting the witness. * * We infer partiality from the circumstance that the witness * * has on some occasion expressed hostility to the opponent": 2 Wigmore, § 940.

And in another place in the same chapter:

"On the principle of fairness and of the avoidance of surprise, the settled rule obtains in offering evidence of prior self-contradictory statements that the witness must first be asked while on the stand whether he made the statements which it is intended to prove against him. Does the same rule apply to the use of evidence of former statements of the witness indicating bias? Must the witness first be asked whether he made them? He must as a matter of principle. For the same reasons of fairness, that require a witness to be given an opportunity of denying or explaining away a supposed self contradictory utterance, require him also to have a similar opportunity to deny or explain away a supposed utterance indicating bias": 2 Wigmore, § 953.

And in the very opening words of the chapter he says:

"The process of *impeachment* or discrediting is fundamentally one of circumstantial relevancy. What is the process? The inference is (for example) that, because the witness X is of an untrustworthy disposition, therefore he is probably not telling the truth on the stand * * or because he has hostile feelings towards the opponent, therefore he is probably not telling the truth."

Our own Reports are full of illustrations where hostile statements showing bias have been recognized as one method of impeachment. In *State* v. *Stewart,* 11 Or. 52 (4 Pac. 128), there was an objection to proof of hostile statements by a witness. The court said:

"The argument is that the same strictness of rule is not observed * * in showing hostile declarations of a witness for the purpose of affecting the value of his testimony, as in admitting contradictory statements *for the same purpose. The object of the proof is the same,* and the same reason exists to refresh

his memory with the particular facts, and afford him an opportunity for explanation.''

And then quoting with approval from another case (*Baker* v. *Joseph,* 116 Cal. 178):

''No mode of ascertaining the state of feelings of the witness exists, except that disclosed by the declarations or the acts of the witness *sought to be impeached* by these declarations.''

Again, in *State* v. *Mackey,* 12 Or. 154 (6 Pac. 648), the court said:

''There is no distinction, so far as the rule is concerned, between admitting declarations of hostility of a witness for the purpose of affecting the value of his testimony, and admitting contradictory statements for *the same purpose.''*

Again, in *State* v. *Ellsworth,* 30 Or. 145 (47 Pac. 199), it is said:

''It is difficult to see on what ground this evidence was excluded, as it is perfectly well settled that on cross-examination a witness may be interrogated as to any circumstance which tends to *impeach his credibility,* by showing that he is biased against the party conducting the cross-examination.''

It seems to me that, under all the authorities, evidence of hostile declarations is only a method of impeachment, and that the purpose of the questions was accurately and properly presented to the court, when the statement was made that the evidence was offered for an impeaching purpose. So far as my personal observation goes, it has been the universal practice of the bar, ever since the decision in *State* v. *Stewart,* more than thirty-five years ago, to treat evidence of hostile declarations, as impeaching evidence, and to so state its purpose to the court when offered.

It is true that Sections 863 and 864 of the Code, which provide for certain methods of impeachment, do not specifically refer to hostile statements, such as are in question here; but it does not seem to me that these sections can be construed as definitive of the word "impeachment" or intended to narrow its accepted meaning. These sections do not purport to exclude any other methods of impeachment than the ones legislated about (except impeachment by proof of particular wrongful acts). Our courts have never given them any such construction, but, on the contrary, as we have already seen, have held repeatedly that the credibility of a witness can be attacked in other ways not mentioned by the statute. In this case the attorney for defendant did not say that he offered the evidence *under the statute,* but his offer was as broad as the definition of "impeachment," and included any method of impeachment known to the common law. The court could not possibly have been misled, for the proof offered did not tend in the slightest degree to establish any other impeachment, except that of personal hostility.

In this case I am not clear that an error in excluding this evidence would be sufficiently serious to justify a reversal under the circumstances. It must have been entirely plain to the jury, by other evidence which was in the case, that this particular witness was hostile to defendants, and a strong partisan of deceased, in whose employ he was. It is not likely that the admission of his prior declarations would have made the least difference in the result. The ruling does not seem to have been considered of great importance by the defendant, and is hardly referred to in the brief on his behalf.

I do think, however, we should not disturb the long-settled rule that questions of this kind are impeaching questions, and can be so treated by the parties and their attorneys, and should be so regarded by the court.

Rehearing denied October 5, 1920.

PETITION FOR REHEARING.

(192 Pac. 640.)

The defendants, William Holbrook and J. E. Paddock, were jointly charged with murder in the second degree for the killing of O. T. McKendree. They did not ask for separate trials, but appeared together and by the same attorneys, and were tried together. The jury found both defendants guilty of manslaughter. The defendants appealed to this court, and here, as in the Circuit Court, the defendants joined hands, for they not only appeared by the same attorneys, but they united by filing a single opening brief and a single reply brief.

The printed abstract filed by the defendants contained more than thirty assignments of error. The defendants did not in their two printed briefs discuss or even mention all the assignments of error. After hearing the appeal, this court, speaking through Mr. Justice BURNETT, rendered an opinion affirming the judgment of the Circuit Court (188 Pac. 947). In that opinion every assignment of error presented by the defendants in the two printed briefs, jointly filed by them, was examined and decided.

The defendants have petitioned for a rehearing; but they have done so through different attorneys and by filing separate petitions. In the petition of

98 Or.—6

William Holbrook six grounds for a rehearing are assigned as follows:

(1) "Permitting the character witnesses of the plaintiff to testify to a specific crime that the witnesses heard defendant Holbrook had committed"; (2) "permitting the state to ask the witness Harry Bailey, who was called by defendants, to testify as to the reputation of the defendant, Wm. Holbrook, for being a peaceable citizen, 'if the defendant Holbrook had not been accused of stealing sheep from Mr. S. B. Chandler'; (3) "permitting plaintiff to give testimony as to the reputation of deceased, for being a peaceable citizen"; (4) refusing to permit Letcher Holbrook "to testify concerning the conversation with the witness Santiago"; (5) refusing to permit the defendants to offer testimony concerning the conversation said to have been had between Santiago and H. C. Lemler on April 17th; and (6) refusal to direct a verdict of not guilty.

The petition filed in behalf of J. E. Paddock enumerates four grounds for a rehearing:

(1) Refusal to sustain a motion directing a verdict of not guilty; (2) refusal to give an instruction upon the subject of circumstantial evidence; (3) permitting evidence of experiments; (4) refusal to permit evidence of the conversation said to have occurred on April 17th between Lemler and Santiago.

In their petitions for a rehearing, the defendants occupy common ground, so far as concerns the question of the admissibility of the statements made by Santiago to Lemler; and, although the contentions made by one defendant do not in any respect conflict with those made by the other, still it will be observed that, with the exception of the statements claimed to have been made by Santiago to Lemler, the petition of one defendant presents questions different from those presented by the petition of the other. The

petition of Holbrook presents and discusses questions which are not even referred to in the two original briefs filed by the defendants. None of the points raised by Holbrook were discussed or even mentioned in the original briefs filed by the defendants, except the point involving the conversation with Lemler and the motion for a directed verdict. The petition submitted in behalf of Paddock presents additional arguments in support of the questions discussed in his petition, although the same questions were presented and discussed at the original hearing.

AFFIRMED.    REHEARING DENIED.

*Messrs. Renner & Chastain, Mr. G. A. Will, Mr. Myron E. Pogue* and *Messrs. Weatherford & Wyatt* for the petitions.

*Mr. W. M. Duncan,* District Attorney, *Mr. W. S. Wiley,* Deputy District Attorney, *Mr. Thomas Drake* and *Mr. W. Lair Thompson, contra.*

HARRIS, J.—It is difficult to convey a clear understanding of the different phases of the several questions raised by the petitions for a rehearing, unless a somewhat extended account is given of the evidence found in the record. Dry Prairie is a plateau located about thirty-two miles from Klamath Falls; it is about five miles north and south and about four miles east and west. The plateau, particularly on the east side, is bordered by an irregular line of hills, upon which are growing trees. The homicide occurred on Saturday, April 20, 1918, at what is referred to in the record as the Holbrook camp. This camp consisted of two tents, which had been set up about one half a mile from the east side of the plateau. As we read the record, the Holbrook camp was located north of a

line drawn east and west through the center of Dry Prairie, although one witness seems to think that the camp was located near the center of the east side of the prairie. One of the Holbrook tents at the Holbrook camp was ten by ten feet in size, while the dimensions of the other were ten by twelve feet. Both tents opened towards the east. The tents were about six feet apart; the larger one standing south of the smaller tent.

Along the east side of Dry Prairie, but south and a little east of the Holbrook camp, are three buildings. One building was one half of a mile distant from the Holbrook camp; the second or middle building was about three fourths of a mile from the Holbrook camp; while the third was about a mile south of the middle building. The building nearest the Holbrook camp is referred to in the record as the Mrs. Paddock homestead; the middle building, as the Paddock homestead; and the third, as the Davis or Paddock ranch house. On the day of the homicide at a point north 35° 25′ east, 1,900 feet from the Holbrook camp stood a tent, known in the record as the McKendree camp. Near the northwest corner of Dry Prairie, and between two and three miles from the Holbrook camp, were some corrals, which are known in the record as the shearing corrals.

About eight years prior to the homicide a post and wire fence had been constructed along a line running east and west for a distance of nearly a mile. A similar fence had also been constructed running north and south for a distance of more than a mile. Succeeding frosts had caused many of the posts to be drawn from the ground, with the result that a considerable portion of the fence was lying upon the ground, and in many places where the posts remained

standing the wires had been severed. The fence line which runs north and south is west of the site of the Holbrook camp, while the fence line extending east and west runs between the McKendree and Holbrook camps, and hence this line is north of the Holbrook camp and south of the McKendree camp. These two fence lines corner at a point which is 2,200 feet northwest from the Holbrook camp. The fence line which extends east and west is, at the point which is directly north of and nearest to the Holbrook camp, about 600 feet distant from that camp.

East of the Holbrook camp, and about 2,550 feet from it, was a spring. In front of and about twenty-five feet from the larger of the two Holbrook tents stood a wagon, over all or most of which had been thrown a wagon cover.

J. E. Paddock owned or controlled several hundred acres of deeded land along the east side of Dry Prairie. This deeded land included the three buildings already mentioned. Paddock had made an application for additional acreage under the act "to provide for stock-raising homesteads and for other purposes." This additional acreage so applied for was north of and adjacent to the deeded lands. We infer from the record that the remainder of Dry Prairie was government land. The Holbrook camp was located on the tract which had been applied for by Paddock. The McKendree camp was located on the public domain.

Letcher Holbrook owned a band of 2,500 sheep, and his brother William Holbrook had a contract under the terms of which the latter was entitled to a certain portion of the wool and increase. On April 12, 1918, Letcher Holbrook, with the approval of William Holbrook, leased the Paddock lands "for the lambing

season, thirty or forty days"; and at the same time
Letcher Holbrook employed Paddock to help with the
sheep during the lambing season. The Holbrook
sheep were at Antelope Springs, about fifteen miles
distant from Dry Prairie. On the morning of Satur-
day, April 13th, the sheep were started for Dry Prairie.
On Monday morning, April 15th, the Holbrook sheep
were driven by Letcher Holbrook and William Hol-
brook and their herders into the southeast corner of
Dry Prairie near the ranch house.

The decedent, McKendree, owned a band of about
2,300 sheep, which had been driven into Dry Prairie
for the lambing season. Jim Santiago, a Spaniard,
was in charge of the McKendree sheep. The state
claims that the McKendree sheep reached Dry Prairie
between the 10th and 12th of April, while the evi-
dence offered by the defendants is to the effect that
none of the McKendree sheep were seen anywhere on
Dry Prairie until Monday, April 15th, after the Hol-
brook sheep had been driven into the southeast cor-
ner of the prairie.

The defendants claim that on Monday, April 15th,
after the Holbrook sheep had entered Dry Prairie,
and while they were being driven north toward the
Paddock homestead, a band of about 800 of the Mc-
Kendree sheep was driven fast from the southwest
corner of the prairie towards the Paddock homestead,
apparently for the purpose of intercepting the Hol-
brook sheep. The witnesses for the defendants say
that, in order to prevent the McKendree and Hol-
brook sheep from mixing, the Holbrook sheep were
stopped and herded back on the hillside. On Tues-
day the Holbrooks attempted to drive their sheep
north, when again they encountered the McKendree
sheep, and again the Holbrook sheep were herded

back. Paddock had agreed with Letcher Holbrook to be at Dry Prairie on Monday, but he was unable to reach there until Tuesday afternoon, April 16th. Paddock says that when he rode into the prairie he found the McKendree sheep in front of the Paddock homestead, and that he informed the McKendree herders that he owned the land there, and directed the herders to drive the sheep off, and that upon the refusal of the herders to comply with his request he himself drove the McKendree sheep away from the homestead. Paddock says that he later met Santiago, and that, when he requested Santiago to move the sheep, the Spaniard claimed that McKendree had leased the land. Paddock says that he then told Santiago that he owned the land and had leased it to the Holbrooks, whereupon Santiago stated that he would move the next day. Santiago had pitched his tent in front of the Mrs. Paddock homestead. Paddock claims that he pointed out to Santiago the lands claimed by him, and that he suggested that Santiago keep his sheep on the west side of the prairie, and move his camp to the corrals, where there was a good spring, so that the prairie could be divided between the McKendree and the Holbrook sheep. On Wednesday, April 17th, the McKendree tent was moved from in front of the Mrs. Paddock homestead to the place designated as the McKendree camp; and on the same day the smaller of the Holbrook tents was moved from a place south of the Paddock homestead, where the Holbrooks had camped Tuesday night, to the place designated as the Holbrook camp. The larger of the Holbrook tents was moved and set up at the Holbrook camp on Thursday. The Holbrook sheep were driven north on Wednesday, and thenceforth were herded along the east side of Dry Prairie. As

we read the record, the McKendree sheep were herded along the west side of Dry Prairie after the McKendree tent had been moved from the Mrs. Paddock homestead. In other words, the McKendree sheep were herded along the west side of the prairie, while the McKendree camp was maintained on the east side, and the Holbrook sheep were herded and the Holbrook camp was maintained on the east side of the prairie.

At this point in the narrative it may be helpful to describe the route pursued by McKendree. At some time after the first appearance of Holbrook at the southeast corner of Dry Prairie, Santiago notified McKendree by telephone of the conditions existing at Dry Prairie. On Friday, April 19th, McKendree left Klamath Falls and stayed overnight at the home of a relative, not far from Dry Prairie. The next morning, Saturday, April 20th, McKendree rode on horseback into Dry Prairie, and first went to the McKendree camp, where he found Manuel Garcia, the camp-tender, and from that point he rode directly to the Holbrook camp.

The evidence is not clear as to the exact time when McKendree first appeared at the Holbrook camp, but it is approximately correct to say that it was between 8 and 9 o'clock A. M., and probably nearer 8 than 9 o'clock. When McKendree left the Holbrook camp, he rode in a northwest direction towards a point about one half of a mile south of the corrals, where he met Santiago. McKendree, accompanied by Santiago, the former on horseback and the latter afoot, then retraced his steps, going in an easterly direction towards the two camps. When McKendree and Santiago reached the fence line which runs east and west, they continued east along and near the fence

line, until they reached a point about north of the Holbrook camp, and there they separated; McKendree riding to the Holbrook camp, and Santiago walking towards the McKendree camp. There is a conflict in the evidence as to whether Santiago reached the Mc-Kendree camp before or after the moment of the homicide. The record does not disclose the exact period of time which elapsed between McKendree's first and second appearance at the Holbrook camp; but it was probably not less than one half an hour, nor much more than an hour. One witness says that the shots were fired at about 9:30 o'clock A. M. Mc-Kendree had a rifle with him when he left Klamath Falls, and he carried this rifle with him from the time he first appeared on the prairie until the homicide. Santiago also carried a rifle when he accompanied McKendree from the point south of the corrals.

The contention made by the defendants as to what occurred when McKendree was at the Holbrook camp the first time is best explained by quoting at length from the testimony of Paddock:

"Mr. McKendree rode up, passed the time of day, and says, 'It appears to me you have got my sheep cut off from camp.' I says, 'No, Mr. McKendree; you have camped in back of your sheep.' I says, 'I asked the camp-tender to put his camp over to the shearing-pens (corrals) when he moved it, before he established it up there.' He asked me then where Letcher Holbrook was; I said, 'Letcher is gone over to the west side to look after some ewes and lambs,' and that Will was in camp. 'Will!'—he called Will, and Will came out, and McKendree says, 'You are going to get 600 bucks into this herd of sheep in the morning, and you will have to herd them.' Will says, 'I am a pretty good herder; I can herd them.' Will says, 'I have good men and good dogs, I can herd them,' and Will says, 'I have got an awfully good dog, and

myself and the dog can herd most any band of
bucks.' McKendree, says, 'You damn son-of-a-bitch,
you can't turn any dogs into my bucks,' and he
jumped off his horse, and, when he jumped off his
horse, I started to get away, and so did Will. Well,
I had turned around with my back to him, and he
says, 'Come back here, you damn son-of-a-bitch, or
I will blow your map off.' That scared me; I looked
around, and he had his gun to his shoulder and
right on to us. I walked—I hesitated a little bit;
he said, 'Get up on this knoll.' I got up on the knoll;
I stayed there; he called us vile names. * * He called
us damn son-of-a-bitches; just about that time his
horse broke away, started to run off, and he says,
'There, I have lost my horse'; he started for it; he
followed the horse over to—the horse had stopped
at the creek; he caught the horse, and got on the
horse, and rode back past the camp, a little to the
north, and as he passed the camp he hollered at me,
he says, 'If I ever catch either of you damn sons-of-
bitches out alone, I will beat you until your mothers
won't know you.' I says, 'Mr. McKendree, don't
come back here and bother us any more'; so he went
on. He went out to the fence on the north and west
of the camp, and he headed west; I didn't pay any
attention to him any more; didn't see where he
went.''

The defendants were the only persons at the Hol-
brook camp when McKendree first rode up to the
tents; nor was there any other person, besides these
three, at the Holbrook camp at any subsequent time
until after the homicide.

Barclay Holbrook, a cousin of William and Letcher
Holbrook, and Dan Blodgett, were herding a portion
of the Holbrook sheep. There is a sharp dispute
between the state and the defendants as to the exact
whereabouts of these two herders, particularly at'
the time when the homicide occurred. The state
claims that Barclay Holbrook and Blodgett were

west of the Holbrook camp at a place where they
could not see what occurred in or near the Holbrook
tents, while defendants contend that these two herders
were about a half a mile from the Holbrook camp at
a point a little north and east of the fénce corner
at a place where they could see whatever happened
in front of the Holbrook camp. After McKendree
left, and had gone to the place where Santiago was,
south of the corrals, William Holbrook left his camp,
and went to Barclay Holbrook, and inquired con-
cerning the whereabouts of Letcher Holbrook, who
had previously gone out west of the camp to look
after some ewes and lambs. At about that time
McKendree and Santiago were discerned coming
toward the east. William Holbrook says that he
thought the person afoot was Letcher Holbrook, and
that because he so believed he returned to his camp.
The undisputed evidence is that William Holbrook
carried a rifle with him when he left camp to inquire
about his brother.

McKendree was shot twice. The theory of the
defendants is that both shots were fired by William
Holbrook in self-defense, and that Paddock was a
mere bystander, taking no part in the killing. An
extended excerpt from the testimony of Paddock
adequately expresses the position of the defendants.
Paddock testified that, when McKendree rode up to
the camp the second time, McKendree said to the
defendants:

"There isn't room in this prairie here for two
bands of sheep; you fellows will have to move."

Continuing, Paddock testified as follows:

"Well, I says, 'Mr. McKendree'; I says, 'Edler
and I used to lamb two bands of sheep; we never
had any trouble; we had plenty of room; I don't

see as there is any reason why we can't lamb two bands here.' Well, he says, 'You don't own· this land in here.' Well, I says, 'Maybe I don't own it, but I have got a filing on it, and I have got a little better right on it than you have'; and he says, 'I don't care how much land you got,' he says, ''There isn't room enough here to lamb two bands of sheep, and I am going to put some bucks in here in the morning, and you will have to herd them'; and he says, 'Where is Will?' I says, 'Will is in camp, in the tent'; so he called, 'Will!' Will came out, and, when he came out, McKendree says, 'Will, you are going to get 600 bucks in here in the morning; you will have to get these sheep off the flat; I am going to have this flat; you will have to move them,' or, 'Will, you will have to herd those bucks.' He started to ride on to me, crowding me back. Will says, 'I am not going to move these sheep off of the flat; I have rented this land; I am going to stay right here'; and McKendree · kept coming towards me; he had gotten up to me close, crowding me back, and I don't remember just [what] words were said in there by Will, but McKendree says, 'I will'—McKendree says,· —'I will blow your map off,' and he dropped his rein, and started to raise his gun, and I grabbed at the horse; well, just at that time, why, the gun cracked over behind me, and the horse whirled to the left, and the second shot fired, and McKendree reeled, and the horse plunged off of that mound, and the horse—and the body went off in this manner [indicating], turned over and fell flat on its back on to the ground, and just at that time, a shot rang out from the McKendree tent.''

When Paddock was asked to state how far McKendree crowded him back, he answered: ''Eight or ten feet.'' As will be observed from the testimony of Paddock, the ,defendants contend that a shot was fired from the McKendree camp. Barclay Holbrook says that he heard four shots; two from the Hol-

brook camp, and two from the McKendree camp. Blodgett testified that he heard three shots; two from the Holbrook camp, and one from the McKendree camp. Barclay Holbrook and Blodgett gave testimony which, if believed, tended to corroborate the stories told by the defendants.

The theory of the state is that the homicide was in reality murder. There is evidence in the record upon which the state contended that, after McKendree met Santiago, they decided to take the McKendree sheep to a place about eight miles from Dry Prairie; that when McKendree and Santiago returned towards the camps their purpose was to get Santiago's horse, so that they could ride together to the place where it was intended to take the McKendree sheep; that when Santiago and McKendree separated at a point near the fence line north of the Holbrook camp, McKendree went to the Holbrook camp to request the defendants to move their sheep a sufficient distance to enable McKendree to get his sheep out of the prairie without mixing; that Santiago, immediately after separating from McKendree, called to Garcia, who was then at the McKendree camp, to get Santiago's horse which was at the spring east of the Holbrook camp. Santiago testified that he was watching McKendree and the Holbrook camp as he proceeded towards the McKendree camp, and that the shooting occurred when he was about halfway between the two camps, but a little nearer the McKendree camp than to the Holbrook camp. Garcia said that immediately after hearing Santiago's call to get the horse, he proceeded towards the spring where the horse was, and that as he walked south towards the spring he watched the

Holbrook camp, and that the shooting took place when he was at the spring.

It is admitted that, from the time McKendree rode up to the camp on the second occasion until the shooting, Paddock was outside and in front of the tents. The defendant Holbrook was inside the larger tent when McKendree rode up. But Holbrook says that he came out of the tent afterwards, although he re-entered the tent to get his rifle; and there is evidence upon which the state contends that the rifle was fired, either while Holbrook was inside the larger tent, or else while standing in the opening of the tent. Santiago says that, when McKendree rode up to the Holbrook camp, he (McKendree) sat on the horse for a moment talking with the man dressed in khaki (admitted to have been Paddock), and then "got down from his horse" and "stood there talking a little while"; that McKendree took off his coat and attached it to his saddle; that, after talking about ten minutes, McKendree got on his horse as though he would come back, and that "at the moment that the horse turned around there was a shot," which came from the Holbrook tent; that the horse started to run, and as the horse was running there was "another shot fired with a pistol" by the man in khaki. The account given by Garcia of what happened is much like the story told by Santiago. Garcia stated:

"I saw the man with yellow trousers (Paddock) lift his arm and shoot a shot."

It is conceded that two rifle shells were found about two feet in front of the larger tent. In addition to the rifle shells, a Luger pistol shell was found a few feet beyond the rifle shells. A Luger pistol was found in the wagon seat under the wagon

cover. In addition to the direct testimony of Santiago and Garcia that they saw Paddock shoot McKendree, there was evidence about the difference between the sound made by the first and second shots, the course taken by the two bullets which struck McKendree, and many other details, from all of which the state argued that McKendree was shot once by a rifle and once by the Luger.

There was evidence from which the state argued that the defendants had moved McKendree's body for the purpose of making evidence for themselves. While riding along the line of the fence about "10" or "11" o'clock A. M., and probably within an hour after the homicide, Walter Buckmaster was hailed by someone at the Holbrook camp. Buckmaster testified that, upon riding up to the camp Paddock, when referring to McKendree's body, said: "We won't say who killed him."

One witness testified that, several weeks previous to the homicide, certain persons in the presence of Paddock were discussing "the range question, and someone said to Paddock, 'Wait until McKendree goes up there [meaning Dry Prairie]; he will feed your range' "; and Paddock answered by saying, "If the son-of-a-bitch comes up there, he will get what's coming to him."

It is stated by all the witnesses, including the two defendants, who saw McKendree at the Holbrook camp, that at the first shot McKendree's horse turned and ran towards the McKendree camp. It was said by Santiago and Garcia that McKendree's horse stood near the tents for a time, and it is admitted by the defendants that the horse was standing there several minutes. Santiago and Garcia say that McKendree turned his horse as though to come to

the McKendree camp, and that the first shot was fired while the horse was in the act of turning. The defendants say that McKendree rode his horse towards Paddock, and crowded Paddock back eight or ten feet. There is evidence from which the state contended that there were tracks showing that a horse had been standing at a place which was sixteen paces from the front of the larger tent, and sixteen paces almost due south from the place where the officers found McKendree's body. There was evidence from which the state could have argued that the horse's hind feet were still at the place where the horse had been standing when the first jump was made to run.

Walter Buckmaster described the place and position of the body as he saw it when he was at the camp in the morning. Witnesses who arrived on the scene late in the afternoon found the body in a different place from that described by Buckmaster, and in a position different from that described by him. When the officers arrived in the afternoon, the rifle lay against the left side of McKendree's body, with the butt of the rifle on the ground and the muzzle elevated above the body. There was blood and sand on the rifle and the state claims that the blood and sand had been ''smeared'' on it. McKendree wore gloves on both hands. There was evidence to the effect that there was no blood on either glove. There is evidence to the effect that McKendree could not have done a single conscious act after he was shot. The state claims that the evidence shows that there was no blood on the outside of the clothing against which the rifle lay, and that the blood found on the rifle could not have gotten there by coming in contact with the clothing.

The blood on the rifle was still damp, according to the testimony of one witness, as late as about 5 o'clock P. M., notwithstanding, according to one witness, there was sunshine that day, and another witness testified that it had been blowing considerably. The defendants would not permit any person to approach near the body until the arrival of the officers. No footprints could be found within twenty feet of the body, although the ground around the body was examined for footprints.

27–29. In the brief filed in support of Paddock's petition for a rehearing, it is argued at length that there was no evidence at all showing that Paddock was more than a mere bystander; that there was no evidence to show that Paddock aided or abetted Holbrook; and that, therefore, the jury should have been directed to return a verdict acquitting Paddock. It is not the province of this court to decide whether Paddock is guilty or innocent, for it is the exclusive province of the jury to decide that question. Our duty is to ascertain whether there was sufficient evidence to carry the case to the jury. If the jurors believed the evidence relied upon by the state, then it is clear, from the foregoing extended statement of the record, that there was evidence upon which the jury could have found that the second shot came from the Luger pistol; that the pistol was fired by Paddock; that Paddock aided Holbrook; that the Luger shot contributed to the death of McKendree, although the rifle shot was necessarily fatal; that the killing was not in self-defense; and that Paddock was guilty of at least manslaughter. In this connection it is apropos to say that Section 1897, L. O. L., is not the only section of the Code defining

manslaughter. Section 1902 is an *omnibus* provision, and by its terms:

"Every other killing of a human being by the act, procurement, or culpable negligence of another, when such killing is not murder in the first or second degree, or is not justifiable or excusable as provided in this chapter, shall be deemed manslaughter."

30, 31. The court properly refused to direct the jury to acquit Holbrook. There was evidence to support the contention made by Holbrook, there was evidence to support the contention made by the state, and consequently it was for the jury to decide, from this conflicting evidence, whether Holbrook was guilty or innocent.

The contention of Paddock that the evidence offered by the state was circumstantial cannot be sustained. Two witnesses, Santiago and Garcia, gave direct testimony that they saw a man, who is admitted to have been Paddock, shoot McKendree. The rule is correctly stated in the original opinion.

32. The evidence concerning experiments was obviously within the rule announced by Mr. Justice BENNETT in *Kohlhagen* v. *Cardwell*, 93 Or. 610 (184 Pac. 261). A careful perusal of the evidence concerning the removal of the body at once makes it plain that the state was entitled to show, if it could, that the body could have been removed to the place where it lay, when the officers arrived, without leaving footprints. And so, too, the state was entitled to show, if it could, that Barclay Holbrook could not have seen a puff of smoke at the McKendree camp. Barclay Holbrook testified that he heard a third shot and then looked in the direction of the McKendree camp, "and I heard the fourth shot, and puff of smoke." Experiments were made for the

purpose of ascertaining whether smoke could have been seen, if a shot had been fired from the Mc-Kendree camp. These experiments met the requirements of the standard fixed in *Kohlhagen* v. *Cardwell,* 93 Or. 610 (184 Pac. 261).

33. Letcher Holbrook had a talk with Santiago on Monday, April 15th, near the Paddock homestead, after the Holbrooks encountered the McKendree sheep, which the defendants claim were driven over to the Paddock homestead. The record does not disclose what answer Letcher Holbrook would have given if he had been permitted to testify. The defendant William Holbrook has failed to point out in his brief wherein, if at all, he was injured by reason of the refusal of the court to permit Letcher Holbrook to relate the conversation which he had with Santiago. This objection, made by Holbrook, must be overruled.

34, 35. The state called ten witnesses in rebuttal, who testified, over objections made by defendants, that McKendree's reputation for peaceableness and quietness was good. Holbrook strenuously contends that this testimony was inadmissible, for the reason that the defendants offered no testimony assailing the character of the decedent. In all jurisdictions the rule is that the state cannot as a part of its primary case offer evidence concerning the decedent's reputation for having been a peaceable and quiet person; but the general rule is that, if the accused assails the decedent's character for peaceableness, the state may then in rebuttal offer evidence showing that the decedent's reputation for peace and quiet was good. The precedents do not agree upon what constitutes an assault upon the character of the decedent. In most and nearly all

of the jurisdictions, the mere fact that the defendant offers evidence that the decedent made an attack, and that the defendant acted in self-defense does not justify the admission of evidence for the state that the decedent was reputed to be a peaceable and quiet man. In other words, the plea of self-defense does not alone in most jurisdictions open the door to the state for the introduction of evidence concerning the decedent's reputation for having been a peaceable and quiet citizen: Note in L. R. A. 1916A, 1245; *State* v. *Potter*, 13 Kan. 414; *Kelly* v. *People*, 229 Ill. 81 (82 N. E. 198, 11 Ann. Cas. 226, 12 L. R. A. (N. S.) 1169). In at least two jurisdictions, including Oregon, the plea of self-defense, accompanied, of course, with evidence tending to support it, has been treated as a sufficient attack on the character of the decedent for peace and quiet to entitle the state to submit rebuttal evidence of his good reputation for peaceableness: *State* v. *Wilkins*, 72 Or. 77, 87 (142 Pac. 589); *Dukes* v. *State*, 11 Ind. 557 (71 Am. Dec. 370); *Fields* v. *State*, 134 Ind. 46 (32 N. E. 780); *Thrawley* v. *State*, 153 Ind. 375 (55 N. E. 95). If the question were *res integra,* the writer would take the view that the opinion in *State* v. *Wilkins* states the rule too broadly. However, the ruling announced in that case had been made before the trial in the instant case, and was the law in this jurisdiction at the time of the trial of the instant case. The holding in *State* v. *Wilkins* entitled the state to offer in rebuttal evidence of McKendree's good reputation for peaceableness, and therefore no error was committed by the trial court in that respect.

Harry Bailey, who had known William Holbrook for seventeen years, was called as a witness for the defendants, and was asked:

"And do you know what his general reputation is, as being a peaceable, quiet, and law-abiding citizen in that community?"

The witness stated that he did know Holbrook's reputation and that it was good.  On cross-examination the following questions were asked and answers given:

"Q. Mr. Bailey, your business hasn't brought you in touch with the sheriff's office, so that you keep track of the offenses committed over there, has it?

"A. Most of the time, I think.

"Q. You heard of Will Holbrook stealing a bunch of sheep from Mr. S. B. Chandler and was compelled to repay the price of the sheep, didn't you?

"Mr. Renner: I object, because it is absolutely improper cross-examination.

"Mr. Thompson: Law-abiding citizens don't steal sheep.

"By the Court: I am frank to say that it is the first time I heard it questioned; I will take about a minute to confirm my opinion on that.  (Refers to book.)  That is the ordinary and common line of cross-examination, and this book seems to support it, and I will have to permit it.

"Mr. Renner: Note an exception.

"A. I may have heard some sort of talk; I don't believe I ever heard anything direct from the sheriff's office.

"Q. You heard it among people over there that this gentleman stole a bunch of sheep from Chandler and Rehart, and the owners compelled him to pay a considerable amount of money to straighten it up, didn't you?

"A. Well, I am not entirely sure whether I did or not; seems—it occurs to me I have heard some conversation of that kind."

On redirect examination the defendant was asked:

"You say you heard something about a Holbrook who had some difficulty with Chandler, in which he

had been charged with stealing some sheep; you have heard some such rumor as that?

"A. Just street talk.

"Q. Wasn't that man, now, Letcher Holbrook, instead of Will Holbrook?

"A. I couldn't say which one it was at all; might have been."

36–38. The question of the propriety of the cross-examination of Bailey is not listed among the assignments of error as required by the rules governing appeals, and therefore the defendants are not in a position to demand a consideration of the question attempted to be presented. Moreover, if either defendant were in a position to assail the ruling of the trial court, it would be apparent from an inspection of the record that the defendants made the issue when they inquired concerning the reputation of Holbrook for being, not merely a quiet and peaceable citizen, but a law-abiding citizen, also. The general rule is that the evidence must be confined to the trait involved in the crime charged; and under this rule the inquiry is usually confined to evidence of the accused's pacific character, or, as frequently expressed, "his reputation for peace and quiet": 13 R. C. L. 914. In the instant case, stealing, considered as a trait, was nowise involved in the crime charged, and on that account the defendants should have limited their original inquiry to Holbrook's reputation as a peaceable and quiet man, but the defendants did not limit the scope of their inquiry. They extended it, by asking concerning Holbrook's reputation for being a law-abiding citizen. The question as asked was comprehensive and all-inclusive. The defendants made the issue, and the cross-examination was within the issue as made by the

defendants. Furthermore, the redirect examination practically destroyed the whole force of the answer to which the defendants objected.

The grounds upon which Holbrook relies for a rehearing have already been enumerated. The language employed by him in stating the first ground relied upon should be observed. The only assignment of error found in the abstract to which this specified ground for a rehearing is referable reads as follows:

"The court erred in permitting the character witnesses of the plaintiff to testify to a specific crime that the witnesses thought Holbrook had committed, being some trouble concerning the stealing of sheep."

W. B. Snyder, the sheriff of Lake County, was called as a witness for the state, and on direct examination he stated, without any objection by the defendants, that Holbrook's general reputation "for being a peaceable, law-abiding citizen" was bad. On cross-examination the witness was asked:

"Isn't it a fact that in your testimony here you have in mind a difficulty which arose between the brother of this man, maybe this man also, and Mr. Chandler, the witness just on the stand, in relation to a controversy over some sheep?"

And the witness, after some additional questions, stated that the difficulty referred to was "the only thing" that he had in mind, and that it was "the only thing" that he had heard against Holbrook. Without any objection upon the part of the defendants, the witness stated on redirect examination that the difficulty arose "over trouble over sheep," and without any objection by the defendants the witness was asked whether the charge involved a violation of law, and he stated that it did.

The defendants did not move to strike out any of the testimony of Snyder. The fact of the difficulty with Chandler was elicited by the defendants, and not by the state. It is true that twice the state asked about the nature of the trouble and each time the defendants objected; but it is also true that neither of the two questions was answered. In this state of the record there is no ground upon which the defendants can complain.

F. P. Light was another witness called by the state. He testified, without any objection by the defendants, that Holbrook's general reputation "for being a peaceable, law-abiding citizen" was bad. On cross-examination the witness was asked:

"Isn't it a fact that all you base—what you say about his reputation, was the difficulty that arose between him and his brother and Chandler about some sheep; isn't that a fact, Mr. Light?"

The witness said that the difficulty with Chandler was "all I know about him," and that the difficulty was "the only thing" upon which he based his judgment as to Holbrook's reputation. The defendants did not move to strike out any of the testimony of the witness Light; nor was there any objection to any part of his testimony concerning Holbrook's reputation.

39. S. B. Chandler was another witness who testified about Holbrook's reputation, and the answer given by him upon cross-examination rather indicated that his testimony about Holbrook's reputation was based largely, if not entirely, upon his difficulty about the sheep. The defendants neither objected to the testimony of Chandler nor moved to strike it out. In this condition of the record the defendants are not in a position to ask for a reversal of the

judgment on account of the testimony of the witnesses Light and Chandler.

After again considering the questions arising out of the refusal of the court to permit the introduction of evidence about the conversation between Santiago and Lemler, the majority of the court reaffirm the reasoning and conclusion of Mr. Justice BURNETT in the original opinion. Mr. Justice BENNETT, however, adheres to the views expressed by him in his specially concurring opinion filed with the original majority opinion. In support of the view of Mr. Justice BENNETT, it may be pointed out that Santiago testified that Paddock and Holbrook chased his sheep from the Paddock homestead; that he (Santiago) got a little mad when Paddock told him to move his sheep; that he talked "considerable number of times" with the defendant Holbrook about the sheep before McKendree arrived; that "I told him I was there first and there wasn't enough land for two"; that he was "a little angry" when he talked with Holbrook; that he had never been over to the Holbrook camp because he "didn't care to go"; and that when he separated from McKendree near the fence, and while proceeding towards the McKendree camp, he looked "toward the Holbrook tent all the time from the time" he left McKendree, "because I thought there was something bad in it. * * I was expecting trouble, because they were fellows that would get after a man to his back and not to his face." There is also evidence in the record from which it could be argued that Santiago objected when McKendree suggested to him to move the sheep, and that McKendree did not permit Santiago to go with him to the Holbrook camp, because he

thought the presence of Santiago might precipitate trouble.

40. When the state filed its printed brief, counsel for the state called attention to the rule, generally followed, that no questions will be noticed upon appeal, except such as are assigned by the appellant, and that all assignments of error not argued by the appellant will be treated as having been waived by the appellant. The rule, to which attention was called by the state, was discussed by the appellants in their reply brief; but the defendants did not, by their reply brief or otherwise, attempt to enlarge the scope of the discussion found in their original brief. However, because of the importance of this proceeding, involving, as it does, the liberties of the defendants, we have disregarded the rule concerning the waiver of assignments of error, and have again examined the whole of the voluminous transcript, and have not only again carefully considered the questions urged by learned and active counsel at the original hearing, but we have also given our most careful consideration to the questions so learnedly and vigorously presented for the first time in the petitions for a rehearing. For the foregoing reasons we come to the conclusion that the verdict of the jury should not be disturbed.

The petitions for a rehearing are therefore denied.

AFFIRMED. REHEARING DENIED.

Second petition for rehearing denied November 16, 1920.

## SECOND PETITION FOR REHEARING.

### (193 Pac. 434.)

*Mr. G. A. Will* and *Mr. Myron E. Pogue* on petition for J. E. Paddock.

*Mr. W. M. Duncan,* District Attorney, *Mr. W. S. Wiley,* Deputy District Attorney, *Mr. Thomas Drake* and *Mr. W. Lair Thompson, contra.*

HARRIS, J.—On page 11 of the manuscript of our opinion, filed October 5, 1920, denying the petitions of the defendants William Holbrook and J. E. Paddock for a rehearing (192 Pac. 640), we quoted from the reported testimony of Garcia and said that he stated: "I saw the man with yellow trousers (Paddock) lift his arm and shoot a shot." Paddock has filed a second petition for a rehearing, and, among other things, the writers of the petition say that they "are unable to find any such language in the record of Garcia's testimony." The point sought to be made by the defendant Paddock is that there was no direct evidence against him, and that therefore his substantial rights were materially prejudiced by the refusal of the trial court to instruct the jury on the subject of circumstantial evidence. As we view the record, the case against Paddock was not entirely dependent upon circumstantial evidence, but upon the contrary there was direct testimony given by the two witnesses, Santiago and Garcia; and when in our written opinion, rendered on the petitions for a rehearing, we quoted Garcia as having

said, ''I saw the man with yellow trousers (Paddock)
lift his arm and shoot a shot,'' we did so for the
purpose of explaining the foundation upon which we
rested our conclusion that there was direct testimony
against Paddock.   If we have erroneously quoted
from the record, then of course the foundation upon
which our conclusion is based is to that extent weak-
ened., We did not, however, erroneously quote from
the record, but the answer ascribed to Garcia is
exactly as it is written in the record which the de-
fendants presented to us on this appeal.   As shown
on page 122 of the transcript of testimony, near the
bottom of the page, counsel for the defendants, when
cross-examining Garcia, asked the following ques-
tion: ''What did you see when you heard the next
shot?''   And Garcia answered thus: ''I saw the man
with yellow trousers lift his arm and shoot a shot.''
There is no controversy whatever about the identity
of the man referred to as ''the man with yellow
trousers,'' for it is conceded that Paddock was that
man, and for that reason we parenthesized the word
''Paddock'' when quoting from the record.

Of course, both Santiago and Garcia were too far
away from McKendree and Paddock to hear them
talking; and although Santiago and Garcia, when
describing the actions of McKendree, referred to him
as ''talking'' with Paddock, nevertheless Santiago
testified, as shown on page 103 of the transcript of
testimony, that he did not hear anything that was
said, and Garcia likewise testified, as appears on
page 121 of the transcript of testimony, that he did
not hear what was said.   Our conclusion that there
was direct evidence, as distinguished from circum-
stantial evidence, tending to show that Paddock shot
McKendree, did not involve the assumption that

either Santiago or Garcia could hear what may
have been said by anyone at the Holbrook camp.
But Santiago and Garcia told about what they saw,
and in our judgment their testimony included direct
evidence against Paddock. The fact that Santiago
and Garcia were a considerable distance from the
Holbrook camp when the shooting occurred does not
of itself make their evidence circumstantial. This
feature might have been appropriately considered
by the triers of the facts when weighing the testi-
mony of these two witnesses; but the court cannot
as a matter of law say that the distance from which
Santiago and Garcia saw the shooting of itself
rendered their testimony circumstantial in character.

Aside from the question of the accuracy of the
testimony ascribed to Garcia, the second petition for
a rehearing filed by Paddock involves no new ques-
tions and presents no new arguments. With a full
understanding of the responsibilities assumed by
those upon whom rests the duty of final decision,
we have given to the questions involved in this
appeal our most careful consideration and best
thought and judgment; but after doing so we are
unable to agree with the contentions which counsel
for the defendants have so earnestly, sincerely, and
zealously presented. We have now neither the duty
nor the right to decide the facts, for that duty rested
upon and has been performed by the jury. We have
announced and applied the law as we understand it;
and, as we view the record, the defendants were tried
by a jury according to the laws of the land.

The result, then, is that the petition must be denied.

AFFIRMED. REHEARING DENIED.