Argued January 9, affirmed May 2, 1962

## STATE OF OREGON v. RUFF

370 P. 2d 942

*Glenn D. Ramirez,* Klamath Falls, argued the cause and filed briefs for appellant.

*Dale T. Crabtree,* District Attorney, Klamath Falls, argued the cause for respondent. With him on the brief were Sam A. McKeen, Deputy District Attorney, and Robert M. Redding, Klamath Falls.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, GOODWIN and LUSK, Justices.

PERRY, J.

This is a criminal action. The defendant was indicted for second degree murder and convicted of the

lesser offense of voluntary manslaughter, committed by stabbing one Joe Penasse with a hunting knife. From the judgment rendered, the defendant appeals.

The uncontradicted evidence in this case discloses the defendant, in company with the deceased and others, decided to go hunting. They were in the automobile of one of the hunting party. They took with them a gun and a hunting knife. After shooting at a few rabbits, they spent the greater part of the day riding around in the automobile consuming a quantity of beer and wine. The defendant and the deceased considered themselves to be in love. The deceased was of a jealous nature and resented attentions assumed by other men toward the defendant. While they were on this so-called hunting trip Penasse had the driver stop the automobile and he and the defendant got out of the car and, according to her testimony, had words over the attentions another man seemed to be showing towards the defendant. Following this altercation, they all drove to the home of the defendant's brother where they planned to have something to eat. When they arrived at the home of the defendant's brother the altercation which resulted in Penasse's death arose. Of this particular occasion one witness testified as follows:

"* * * we pulled in the yard and I stopped, and Verna Lee got out of the car first, and then Bobby Lee got out of the car and went around the house or in the house or some place, I didn't see where he went, and Joe Penasse said, 'I'm going back to Klamath Falls with you guys.' And Verna Lee, she didn't get back in the car, she was standing by the open car door, and she was trying to coax him in the house so we could go in and cook something to eat; but he wasn't having any of that, he was coming back to Klamath Falls with us. And

she kind of had one arm on the door, it was open, the dome light was on, and he had the half gallon in the back seat and it was about two-thirds gone then from Beatty back to Sprague River—or the gallon was, pardon. And she said something about come on in to eat, and something. Then Joe Penasse says, 'No, by God, I'm not,' and I'll show you, or I'll fix you, or words to that effect, I don't remember just what, but it was words to that effect.

"And he pushed the front seat forward and got out, and he started hitting her, and she backed away from him. And as she backed away from him they kind of went, oh, towards the rear of the car in a way kind of out of my line of vision. And she said then, 'I'll kill you.' Then I looked around, leaned forward and looked around, and they had fell to the ground, slipped or fell or he knocked her down or whatever happened, but anyway they fell to the ground and he fell on top of her. Then I sat back in my seat and just sat there.

"Well, Mr. Bryant was really passed out in the back seat.

"Then Joe Penasse got up. Then as he got up he staggered back towards the open car door. And about that time he said, 'She stabbed me.' Then he took a few steps forward, back towards where Verna Lee was standing like he was going to go after her again—Anyway, he went towards her, and then he fell down on the ground."

The defendant, after stating the deceased had often threatened her with death if she went with other men and of occasions when he had inflicted corporeal punishment upon her, testified of the event which led to the knife wounding of Penasse and his eventual death as follows:

"Well, when we arrived there at Sprague River at my brother's home he was sitting in the middle in the car and I was on the outside near the door. I got out and let him out to go and unlock the

house. Johnny Holt and Howard Bryant and Joe and I were in the car. And they wanted something to eat, they were hungry, so we were going to go in and eat, cook.

"THE COURT: Can you hear?

"A And Joe had been giving me trouble all the way back from Beatty, and I was feeling bad about it, and so I tried to get him to make up with me. Well, he was still angry, and he called me names. Excuse me just a moment. And so I told him to step out anyway, I wanted to talk to him. So he got out, and I tried to get him to kiss me. I told him 'Let's forget about this trouble,' it only happened when we were drinking heavily like that. But he continued to swear at me. And so I asked him to kiss me and let's make up. And he gave me a shove, and he said, 'Let Howard Bryant kiss you.' And so—He said, 'I'm going to fix you.' So he give me—he knocked me backwards, and when I got my balance again I was looking at him and he was taking his hand out of his pocket. And he always kept a beer can opener in this pocket—

"MR. REDDING: I am sorry, I couldn't hear that.

"THE COURT: Repeat that last part.
    "(Thereupon the last two sentences of the
    last answer were read.)
"A (Continuing)—and I thought he was bringing that out to cut me with. So I pushed him off balance, I gave him a shove, and as I did he dropped this object thing from his hand. I got a glimpse of it, and so I was trying to reach for it, and he hit me on the side of the head as I was bending over, and I got it anyway. Then he grabbed me by the hair and started pulling me upwards. And I had the knife between by knees holding it so he couldn't get it. Then he got me in front of my coat and was twisting against my throat, was choking me, and then I started hitting his hand

with this hand, the knife (indicating). I didn't know whether the blade was turned up or down, so I didn't know whether it was cutting him or not. But he let go of me, and then hit my arm like that (indicating), knocked it down and knocked me down at the same time. I fell, and he fell on top of me. And when we fell I lost the knife, I didn't have it any more, and I thought he had it. I thought he was really going to knife me then, so I started calling for my brother. And when I called he raised off of me, and I thought my brother had come out. So he left me, he got away from me, and I got up, by then he was still facing me, and I looked and my brother wasn't there. And I started in the house, then I looked back and he was down. And I thought he had had another attack, or that he was trying to get sympathy so my brother wouldn't be angry at him for what he had done to me just then."

In addition to the above there is evidence from which a reasonable conclusion could be drawn that at the time she states she was attempting to make up with the deceased she had in her hand the hunting knife with a six to eight inch blade.

The defendant's first assignment of error is that the above facts are insufficient to support the verdict of guilty and her motion for a directed verdict of acquittal should have been granted. The defendant's contention is based upon the belief that from the facts as above set out reasonable minds can reach no conclusion except that this was an excusable homicide as defined in ORS 163.110, which reads as follows:

"The killing of a human being is excusable when committed:

"(1) By accident or misfortune in lawfully correcting a child or servant, or in doing any other lawful act, by lawful means, with usual and ordinary caution and without any unlawful intent.

"(2) By accident or misfortune in the heat of passion, upon a sudden and sufficient provocation, or upon a sudden combat, without premeditation or undue advantage being taken, and without any dangerous weapon or thing being used, and not done in a cruel or unusual manner."

The taking of the life of Joe Penasse would be lawful and defendant's contention could be sustained only if reasonable minds could reach no other conclusion from all of the evidence than that the death was purely accidental or that the defendant acted in self defense.

While it is not necessary that the defendant establish the fact that the death was accidental or the defendant acted in self defense to have a jury return a verdict of not guilty, as it is only necessary that the jury entertain a reasonable doubt in these respects, nevertheless, it is for the jury to determine whether or not there is a reasonable doubt. *State v. Holbrook,* 98 Or 43, 188 P 947, 192 P 640, 193 P 434. From the record as above set out, it should be noted reasonable minds could reach different conclusions on whether the death was accidental or whether it was necessary under the circumstances for the defendant to take life to save herself from death or great bodily injury or whether it was done in sudden heat or passion without malice or deliberation constituting manslaughter as defined in ORS 163.040. Where different conclusions may reasonably be drawn from the facts and circumstances of the case this court will not weigh the evidence. *State v. Jones,* 179 Or 636, 173 P2d 960.

The defendant sets forth numerous assignments of error based upon instructions requested and not given and the instructions given by the trial court.

We have carefully examined each assignment of error and find no error in either the instructions given

or in the refusing of defendant's request. The instructions given by the court fully covered every aspect of the case and correctly stated the law applicable.

The defendant also assigns as error the court's refusal to grant a new trial because of misconduct of a juror. The basis of defendant's contention is so specious that it should not be dignified by answer thereto.

We have carefully considered the entire record in this case and find no error therein. The defendant received a fair trial. The judgment is affirmed.